**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
**ELDER LAW AND DISABILITY**
    **RIGHTS CENTER**
1535 E 17th Street
Santa Ana, California 92705
t. 714-617–5353
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org

**CAROL A. SOBEL** SBN 84483
**MONIQUE ALARCON** SBN 31165
**LAW OFFICE OF CAROL SOBEL**
725 ARIZONA AVENUE, SUITE 300
SANTA MONICA, CA 90401
T. 310 393 3055
E CAROLSOBELLAW@GMAIL.COM
E. MONIQUE.ALARCON8@GMAIL.COM

**PAUL L. HOFFMAN** SBN 71244
**CATHERINE SWEETSER** SBN 271142
**COLLEEN M. MULLEN** SBN 299059
**SCHONBRUN, SEPLOW, HARRIS &**
    **HOFFMAN**
11543 OLYMPIC BOULEVARD
T. 310 396-0731
E. HOFFPAUL@AOL.COM
E. CSWEETSER@SSHHLAW.COM
E. CMULLEN@SSHHLAW.COM

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| HOUSING IS A HUMAN RIGHT ORANGE COUNTY, an unincorporated association; ORANGE COUNTY CATHOLIC WORKER, an unincorporated association; EMERGENCY SHELTER COALITION, a non-profit corporation; DUANE NICHOLS, DARREN JAMES, BRUCE STOVALL, all as individuals and on behalf of the class of similarly situated individuals, <br><br>         Plaintiffs, | Case No.:  18-cv-00155 DOC KES <br><br> FIRST AMENDED COMPLAINT: CIVIL RIGHTS <br><br> 42 U.S.C. § 1983: 1st, 4th, 5th, 8th and 14th Amendments; 42 U.S.C. § 12132, 12133 (ADA); Cal. Const. Article I, §§7,13; Cal. Civ. Code §§52.1; Cal. Gov. Code §11135; Cal. Gov. Code § 65583 *et seq.*; Cal. Civ. Code § 815.6 |

1    v.

2

3 THE COUNTY OF ORANGE, THE CITY
OF IRVINE, THE CITY OF ALISO VIEJO,

4 THE CITY OF DANA POINT, THE CITY
OF SAN JUAN CAPISTRANO, THE CITY

5 OF SAN CLEMENTE,

6

7    Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURISDICTION AND VENUE

1.        This is an action for injunctive and declaratory relief and damages for the individual plaintiffs pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as federal statutory law applicable to individuals with disabilities.  Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on questions of federal statutory and constitutional law, and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.  Jurisdiction for Plaintiffs' supplemental state law claims is based on 28 U.S.C. § 1367(a).

2.        Venue is proper in the Southern Division of the Central District in that the events and conduct complained of herein all occurred in Orange County.

## FACTUAL ALLEGATIONS
### THE NUMBER OF HOMELESS INDIVIDUALS IN ORANGE COUNTY:

3.        Orange County has one of the largest homeless populations in the State with nearly half unsheltered.  In 2016, the federal Department of Housing and Urban Development (HUD) reported to Congress a total of 3,028 homeless individuals in the Santa Ana/Anaheim/Orange County Continuum of Care (COC), which put the region at the top of all the smaller regional city/county COC's.  That number increased to 4,792 in the 2017 HUD report to Congress, putting the region's homeless population just 167 people below the state of Hawaii.

4.        The numbers submitted by the County were based on the 2017 Point-in-Time ("PIT") count, which grossly understated the total number of unsheltered homeless individuals in the County, particularly in two of the largest cities, Santa Ana and Anaheim.  In January 2017, approximately 1200 individuals were camped in the Riverbed and almost 500 were camped in the Santa Ana Civic Center.  Just a few months before the January 2017 PIT, Anaheim conducted a census that identified just over 900 homeless individuals in the city, more than twice the number in the 2017 PIT.  Similarly, the OC Health Care Agency conducted a

census in late summer 2016 just in the Santa Ana Civic Center and counted 461 individuals.  The numbers of unsheltered individuals in the 2017 Count, by Service Provider Area (SPA) are 936 in the North SPA, 1,362 in the Central SPA, and 286 in the South SPA.  As noted, these numbers are likely a gross undercount.

5.     The initial results of the 2019 PIT report approximately 3700 individuals living on the street and in vehicles, up from the approximately 2400 in the 2017 PIT.[1]  In addition, another 1300 people experiencing homelessness were counted at shelters, down considerably from the 2017 PIT.[2]  On information and belief, six shelters were not included in the PIT count in January but will be included in the final totals.  County officials applied in a different process for conducting the 2019 PIT, asserting that the 2019 count would produce a more accurate result.  *Id.*  Many of the volunteers involved in the 2019 count expressed concerns that recent sweeps by local law enforcement dispersed communities of people experiencing homelessness to avoid citation or arrest, calling into question whether the 2019 PIT, like the 2017 PIT, would still result in a significant undercount of people experiencing homelessness in Orange County.

6.     Now the final 2019 PIT has been released and the numbers are devastating.  With a more accurate process than earlier years, the increase in people experiencing homelessness in the County is up more than 42 percent from the 2017 PIT.  While the greatest increases are in the North and Central SPAs, the South SPA cities saw an increase of over 11 percent from the 2017 PIT count, bringing the total of individuals experiencing homelessness in South County to

---

[1] Spencer Custodio, *Over 3400 Homeless People on OC Streets, According to Initial Headcount*, VOICE OF OC (Jan. 25, 2019), https://voiceofoc.org/2019/01/over-3400-homeless-people-on-oc-streets-according-to-initial-headcount/
[2] *Id.*

4

approximately 763 persons.   This number is greater than the 701 year-round emergency shelter beds reported in the 2019 PIT for the entire county.

**DEATHS OF UNHOUSED INDIVIDUALS IN ORANGE COUNTY:**

7.      The consequences of the county and municipal governments' abdication of responsibility are significant.  Deaths of homeless people in Orange County rose to 210 to 2017, with at least one homeless person dying in nearly all of the 28 cities throughout Orange County.  And although the statistics for 2018 are not yet complete, a recent report released by the Orange County Sheriff's Department found that even more unhoused persons—about 250—died last year. Based on the currently available numbers, homeless people died last year in all but one of the Defendant cities. The one exception is Aliso Viejo, which has the largest number of individuals who stayed at the ASL in Laguna Beach in 2017 other than residents of the City of Laguna Beach.

8.      In a 2017 interview, CEO and Founder of the Illumination Foundation ("IF"), Paul Leon, stated that his organization alone provided inpatient medical care to approximately 70 individuals who were living on the streets.  Leon's assessment was that 90 percent of that number would otherwise have died if they were still unsheltered and not living in the IF facility with medical support.

9.      Responding to the medical requirements of individuals who are unhoused puts an enormous financial and personnel stress on the public health system.  Individuals "experiencing homelessness have high rates of chronic mental and physical health conditions, co-occurring disorders and barriers to health care and affordable housing."  Am. Pub. Health Ass'n, Policy No. 20178, Housing and Homelessness is a Public Health Issue (Nov. 7, 2017) ("APHA 11-7-17"). According to the HUD Annual Homeless Assessment Report to Congress, 32% of more than half a million people experiencing homelessness on a single night in 2016 were unsheltered.  According to the 2017 Point-in-Time count, half of those

experiencing homelessness in Orange County are unsheltered on any night, 50%
above the national average.  APHA 11-7-17.

**HYPOTHERMIA:**

10.    An estimated 700 unsheltered individuals die from exposure to the
elements each winter across the country.  Unsheltered individuals are at a high risk
of developing life-threatening, exposure-related conditions such as hypothermia
and frostbite in the winter and heat stroke in the summer.   In addition to the
immediate act, a person who experiences hypothermia or hyperthermia and
recovers may, nonetheless, suffer lasting brain damage and impairment of other
organs, leading to an increased risk of dying from unrelated health conditions in
the future.  For example, frostbite may result in the loss of blood flow to
extremities, resulting in gangrene, a particular threat to individuals with circulatory
issues and diabetes.
https://www.cdc.gov/disasters/winter/staysafe/hypothermia.html.

11.    Hypothermia occurs when a body loses heat faster than it creates it
and body temperature falls below 95 Fahrenheit.  Hypothermia is generally caused
by prolonged exposure to cold weather, wearing clothes that inadequate to protect
against weather conditions and the inability to get out of wet clothes and get to a
warm, dry location.  *See*  *https://www.mayoclinic.org/diseases-
conditions/hypothermia/symptoms-causes/syc-20352682*.  Wet clothing causes a
20-fold increase in heat loss.  *See* The Healthcare of Homeless Persons, A Manual
of Communicable Diseases & Common Problems in Shelters & on the Streets,
James J. O'Connell, M.D., Editor (2004). When body temperature drops, the heart,
nervous system and other organs begin to fail and, if unresolved, may lead to
death.

12.    Individuals experiencing homelessness are already at greater risk of
illness than the housed population.   By some estimates, the number is three to six

times greater risk of illness for unhoused individuals.  www.nhchc.org/wp-content/uploads/2012/01/Dec2007HealingHands.pdf.

13.    A report by the Mayo Clinic lists a number of factors for hypothermia, all but one of which puts many unhoused persons of greater risk of developing hypothermia.  They include fatigue, older age, mental illness that may interfere with judgment, substance abuse that impairs judgment, diabetes, other medical conditions that impact the body's ability to regulate its temperature, and some medications including antidepressants, antipsychotics, pain medication and sedatives.  *Id.*  Environmental conditions become more of a threat when the individual has a preexisting infection or sepsis.  *The Healthcare of Homeless Personi, Part II, "Accidental Hypothermia and Frostbite,"* p. 190-91.

14.    Southern California cities, in particular, often tout the good weather here as a draw for persons experiencing homelessness around the country, even though no statistical evidence supports that assertion.  Yet, even with our "good weather," hypothermia is a very real threat when the temperature drops below 50 degrees Fahrenheit.  Although this is a baseline temperature, both precipitation and wind will lower the effective temperature and create a risk of hypothermia even when the temperature is above 50 degrees.  For example, if the temperature is 57 degrees with a wind of 15 mph, the effective temperature will be 53 degrees.  *See* https://www.wpc.ncep.noaa.gov/html/windchillbody_txt.html.  If, as recently is the case in Orange County, the night temperature drops to 37 degrees, a wind of 15 knots reduces the effective temperature to 28 degrees, well below freezing.  *Id.*

15.    These are the temperatures being experienced by unsheltered individuals in Orange County over the last several months.  On February 17, 2019, the daytime temperatures in Irvine, Mission Viejo, San Juan Capistrano, San Clemente, and Aliso Viejo were forecast to be around 56 degrees, with nighttime temperatures of 37-38, and winds of 10-20 knots.  *Orange County Register*, 2/17/19, p. A17; *Orange County Register*, 2/21/19, p. A22.  On February 21,

2019, the temperatures were one to two degrees lower throughout South County, while the winds remained the same.  These temperatures are more than 10 degrees below normal, while rainfall for the month is already more than twice normal for this time of year.  *Id.*, 2/21/19, p. A22.   For people experiencing homelessness, the risk of hypothermia or other serious illness is significantly increased in these wet, windy conditions.

16.     The County recognizes the serious threat cold, windy and wet weather present to the unhoused.  Because of the severe winter weather, Orange County opened the Santa Ana and Fullerton armories all day from Thursday, February 14 through Saturday morning, February 16 at 6 a.m, after which the armories will return to limited access hours from 7 p.m. to 6 a.m.

17.     When the National Weather Service issued an alert regarding severe cold temperatures, the County government issued a notice to people to protect their pets from the adverse effects of cold weather, including hypothermia.[3]

**SOUTH COUNTY SHELTERS:**

18.     The Alternative Sleep Location (ASL) in Laguna Beach is the only low-barrier shelter in South County.  It is a very small shelter, with a capacity of 45 beds in trailers, open only at night.  The facility opened following a settlement in a lawsuit challenging police enforcement of anti-camping laws against homeless individuals in Laguna Beach.

19.     According to Homeless Management Information System (HMIS) data, of 401 people who stayed at the ASL and who provided a "last known permanent address," more than half of these individuals reported an address in Orange County but outside of Laguna Beach.  Only 11 percent of the guests reported a last known address in the City.  Aliso Viejo topped the list of other Orange County cities with 28 individuals, totaling seven percent of the population

---

[3] https://media.ocgov.com/go/occr/animal/about/newsdetails.asp?News!D+5083.8/TargetID=87

8

at the ASL.  Mission Viejo had the second largest number of guests at the ASL, with 13 individuals, followed by San Clemente with 10 individuals.

20.    Until recently, the facility did not open until 6 p.m. and required people seeking entry to arrive no later than 8 p.m.  The City provided limited free transportation to and from the facility, which is located in Laguna Beach Canyon. The shelter closed for the day at 7:30 a.m.  This month, a van service was instituted, providing more opportunities to travel to and from the ASL.

21.    Starting on February 4, 2019, the ASL introduced a pilot program, "enrolling" clients and, for the broader group of those experiencing homelessness, opening the shelter on a drop-in basis for showers, laundry, mail, lunch, computer access and social services from 10 a.m. to 1 p.m.  Under the new program, only persons enrolled in the new program will be allowed in the shelter from 5 p.m. to 10 a.m. No drop-in services will be offered during these hours.

22.    Those individuals approved for the enrollment program are offered overnight places at the shelter for 30 days, extendable if the person actively pursues housing solutions in that time period.  Each enrolled person is assigned a housing coordinator to help create a housing plan.  For now, enrollment is restricted to persons who meet the city's "locals" conditions and prioritization criteria set by the ASL.

23.    The ASL is full nearly every night, with individuals sleeping outside, where they are often subjected to questioning and harassment by the police.  The only recommendation the ASL suggests for alternative shelter is the County winter shelter program at the two armories in the North and Central SPA.  Those suggestions are not practical because of the limited options for transit to those facilities, as well as recently-imposed restrictions on admission.

**PAST LITIGATION IN ORANGE COUNTY:**

24.    Plaintiff ORANGE COUNTY CATHOLIC WORKER filed a lawsuit against the County of Orange and the cities of Orange, Anaheim and Costa Mesa

on January 29, 2018.  Case No. 18-cv-01115 DOC - JDE  (C.D. Cal.).  The lawsuit
challenged the County's intended closure of the Santa Ana Riverbed encampment.

25.     In response to the Court's order to end the encampment at the
Riverbed, and the Court's subsequent order to end the encampment at the Santa
Ana Civic Center, the County Board of Supervisors (BOS) voted to open three
temporary emergency shelters to provide placements for the majority of the
approximately 1200 people displaced from the Riverbed and Civic Center.  The
three temporary facilities were to be located in Irvine, Huntington Beach and
Laguna Niguel.  The announced intention of the BOS was to open the Irvine
location first and then, if more space was needed, open the temporary facility in
Huntington Beach and, if more additional space was needed, open the temporary
facility in Laguna Niguel.

26.     The County's plan was met with intense opposition from each
community.  Nearly 600 Irvine residents traveled to the BOS meeting to protest
against the plan.  Despite having the third largest number of homeless individuals
of any City in the County,[4] 199 in the 2017 Point-in-Time count,[5] Irvine and
officials and residents adamantly argued that there was no place in Irvine – the
largest land mass city in the County - that could accommodate an emergency
shelter, let alone any shelter. [6]  The City identified multiple zones where shelters
could be placed by right.  In Appendix D to the City's 2013 Housing Element, the

_____

[4] In Appendix D to the 2013 Irvine General Plan, the City identified a far greater
number of homeless individuals in the City, which appears to be an error.
" Irvine's share of the regional unsheltered homeless population is estimated to be
2,280 individuals."
[5] Only Santa Ana and Anaheim had more homeless persons in the 2017 PIT count.

[6] In the 2017 Point-in-Time Count, Huntington Beach had the sixth largest
homeless count with 119 individuals.

City wrote that emergency shelters are permitted by right in the IBC Multi-Use, General Industrial, Medical and Science, Business Park, and Institutional zones. Despite that representation to the California HCD, the City threatened to sue the County if a shelter was opened. The City listed these properties as a necessary statutory requirement for the City's General Plan to be approved by the State of California. Without meeting this requirement, the City would not be permitted to approve any permits for development in the entire City, including permits for all of the upscale residences at the former military base.

27.    In late April 2018, the South County Mayors counter-proposed use of a former elementary school in Silverado Canyon. Subsequently, the possibility of using the now closed juvenile detention facility in the Cleveland National Forest was also raised. Neither site was appropriate. Both were isolated and did not meet the requirements of SB2 to ensure that facilities for unhoused persons were close to transportation so that individuals can get to work, access social services, medical appointments, and other basic resources.

28.    It is unlikely that even homeless persons with an income from a low-wage job or disability can find rental housing in South County that is affordable. On June 1, 2017, HUD issued a report finding that the vacancy rate in Anaheim, Santa Ana, and Irvine declined from 2010 to 2017 from 5.9 % to 3.6%, and average rents rose 3% in May 2017 alone.[7] Almost 90,000 people are on the County's housing authority waiting lists hoping for access to affordable housing.[8]

------

[7] U.S. Dep't of Housing and Urban Development, Office of Policy Development and Research, *Comprehensive Housing Market Analysis Anaheim-Santa Ana-Irvine, California*, https://www.huduser.gov/portal/publications/pdf/AnaheimCA-comp-17.

[8] Susan Price, An Assessment of Homeless Services in Orange County, http://bos.ocgov.com/ceo/care/HOMELESS%20ASSESSMENT%20DCC%20REPORT_10.18.2016.pdf, pg. 21

29.    The lack of adequate and appropriate resources was reinforced in a 2017 report issued by United Way, prepared with the University of California Irvine and the Association of California Cities.   The report, "Homelessness in Orange County: The Costs to Our Community," found that 75 percent of homeless individuals surveyed lived in Orange County for at least six years, with most more than 10 years.[9]   Cutting against the stereotypes that homeless individuals are substance abusers or mentally ill, the United Way report found that the single greatest factor leading to homelessness in Orange County, by far, is "the gap between the availability of affordable housing and work that pays a wage sufficient to enable the economically marginal to access that housing."[10]

30.    Each of the Defendants has failed to meet the requirements in state law to provide for people experiencing homelessness in their jurisdiction as a necessary prerequisite to approval of the entities General Plan for development. While the County has created several hundred more low-barrier and bridge shelter beds over the last three years, it is nowhere near the number of beds needed to address their responsibility.  None of the municipal defendants has made any attempt to meet this need and most have blocked efforts to place shelters in their communities.

31.    Moreover, none of the municipal Defendants have met the specific statutory obligation to identify how the entity will meet the needs of homeless individuals in their jurisdiction.   Each Defendant has simply listed most of the same shelters in other cities, predominantly Santa Ana and Anaheim.   At the same time, all of the municipal defendants have continued to enforce, or threaten enforcement of local and state Penal Code provisions criminalizing homelessness

---

[9] Homelessness in Orange County: The Costs to Our Community, *available at* unitedwayoc.org/wp-content/uploads/2017/08/united-way, p. 31.
[10] *Id.*, p. 34.

through laws that make it unlawful to be present, have property, sit or sleep in a public place even if a person is without a home.

32.     The need to respond to the increasing numbers of unsheltered individuals in Orange County is hardly new and neither is the disfavored approach of criminalizing - rather than housing - people who are homeless.  More than a decade ago, the Orange County Grand Jury issued a report on "The Homeless Crisis in Orange County."  The report noted then that "[h]omelessness is on the rise, often misunderstood, and is inextricably linked to poverty."  From 1990 to 2005 the homeless population increased at a far greater rate than the overall increase in population in the County.  The Grand Jury report concluded that addressing the problem "does not appear to be a priority with the Board of Supervisors."   The Grand Jury listed a series of measures to address the crisis then being considered by various municipal entities in the County, including plans to add housing for homeless individuals at the former El Toro Marine Air Station; shelters in San Clemente, Buena Park, Westminster, La Habra and Cypress, and a very "humanistic" outreach approach by the Santa Ana Police Department and Orange County Sheriff's Department.  A dozen years later, few, if any, of these intentions have been realized.

33.     The 2005 Grand Jury Report also reviewed the history of proposals in similar reports, going back to 1988 and found that few of the earlier recommendations were implemented. The Report proves that, over the past 25 years, the primary response of the County and the Cities has been to treat the visible presence of homeless people as a blight, without significantly reducing the number of residents on the street each night.  These approaches include criminalizing homelessness by arresting homeless individuals for loitering, making it illegal to sleep in public places at night, seizing and destroying homeless people's property, and engaging in a pattern of warrantless stops and interrogations.  The identical practices have been repeatedly challenged and

enjoined by judges of the Central District in Los Angeles and the Ninth Circuit, uniformly rejecting these practices criminalizing homelessness as a violation of the First, Fourth, Eighth and Fourteenth Amendments.

34.     The 2017-2018 Grand Jury Report, "Where There's Will, There's a Way Housing Orange County's Chronically Homeless," issued in late May, 2018, echoed the conclusions in the 2005 Grand Jury Report.  It cited the lack of political will and cooperation between the County and the cities as a significant factor in the inability to develop and implement a comprehensive plan to address the unhoused population in the County, emphasizing the extraordinary cost benefits to providing housing and services as a proactive measure.

35.     Beyond the financial costs to the government from having a significant unsheltered population living on the streets and in the parks, the Grand Jury underscored the dire consequences for people left to survive on the streets.  As discussed above, people experiencing homelessness are more susceptible to illness and infection because of exposure to the elements, poor nutrition and other factors. The consequence is that the average life expectancy for an unhoused person in the United States of only 50 years, almost 50 percent less than the 78-year life expectancy for the housed population.

36.     Defendants' approach is even more indefensible when viewed against the directives by the United States Interagency Council on Homelessness ("USICH"), composed of nineteen federal cabinet and agency heads to organize federal efforts to end homelessness. The most recent USICH report, "Ending Homelessness for People Living in Encampments," emphasized the importance of "intensive and persistent outreach and engagement," but underscored that outreach is meaningless without real options for placements and services.

37.     The San Clemente plaintiffs illustrate this point.  The City contracted with Mercy House to provide services, but the only shelter option offered is the Courtyard in Santa Ana.  That is not a realistic option for a number of reasons.

First, the Court restricted other cities across the County from "dumping" individuals off at the Courtyard when those same cities lacked shelters in their own jurisdictions. This disfavored practice led to increased numbers of homeless individuals in Santa Ana and Anaheim, the two cities in the County that have carried more than their share of the obligation to address homelessness.

38.    Requiring individuals to travel to Santa Ana or Anaheim to find shelter is an impossible challenge for those with disabilities for a number of reasons. As the County has now recognized, among other deficiencies, the Courtyard is not structured to accommodate individuals with significant disabilities, as many unsheltered individuals have.

39.    The physical factors at the Courtyard do not provide adequate reasonable accommodation of disabilities. For persons with a trauma-enhanced disability, the conditions in the Courtyard, as well as the two County-run emergency winter shelters at the armories, exacerbate their mental health conditions. The numbers at the Courtyard are near or above 400 persons each night, sleeping in close quarters on small cots with no privacy for women. On most nights, people camp on the sidewalk outside the Courtyard because they cannot get a bed inside.  Because the Courtyard is not near any other shelter, a person who shows up and is told that the Courtyard is full has no choice but to sleep outside because it is too late to find transportation and get to other shelters to ask for a bed, such as the armories, before they close for the night. Most of the year, there is no other shelter available.

40.    In April 2018, to ensure that there was space for individuals being relocated from the nearby Santa Ana Civic Center, the Court limited the County from placing people who were not Santa Ana residents at the Courtyard and also directed that other cities, acting through contract agencies such as CityNet, stop transporting people to the Courtyard to ensure that there was space for individuals being relocated from the nearby Santa Ana Civic Center encampment. Until the

Court's directive, people were regularly dropped off there by hospitals, various cities' police, social workers contracted with other cities in the County, and others with nowhere else to bring homeless people.

41.    The only other options for low-barrier facilities are the winter emergency shelters at the armories in Santa Ana and Fullerton, both of which suffer from numerous deficiencies.  People sleep on thin mats on the floor, making it difficult for anyone with a physical disability to accommodate to as a matter of course.  There is no provision for persons with psychological trauma.  Moreover, the armories only accept people who are able to come and go at the restricted hours. For those who work, need to attend court or school or meet with service providers, restricted entrance and exit hours impose an additional and often insurmountable hurdle.  Both armories require individuals to leave very early in the morning and preclude readmission until the evening.  Beginning this year, the armories will not allow walk-ups.  People must leave the area in the morning and come back in the late afternoon on a scheduled bus.  While this change was, no doubt, made to discourage individuals from moving to nearby parks to wait all day until the armory reopened, the impact of this policy change is devastating.  There is no place for unsheltered individuals to stay safely during the day without facing a threat of citation or arrest if they are in public places with or without their property.

42.    The third reason why transporting people from South County to Santa Ana and Anaheim is an untenable and unlawful solution is that it makes it nearly impossible for homeless individuals to get to jobs and services in South County. San Clemente is 31.5 miles from Santa Ana.  By public transportation, the travel time is nearly 2 hours once a person gets to the train transit sites at either end, which involve walking slightly more than a mile at each end.  For a disabled individual, the one-mile walk can take considerable time, because of physical mobility and cognitive impairments.  For an individual with circulatory problems and other medical conditions, the walk to get to the train may be physically

impossible.  For someone such as Plaintiff Duane Nichols, it may be unnavigable because of his visual disability.  Finally, for any unsheltered person, the cost of the train may be prohibitive and they have no place to put their property.

43.    In addition to the Courtyard and Bridges, there are private facilities providing a continuum of options for unhoused persons.  Each has strict limitations on eligibility for services.  Nearly all have significant time constraints on how long a person may reside at the facility, ranging from one night to six months.  Some require a referral and/or a background check for entry, which can delay entry for days or weeks.  Some are restricted by gender, some for pregnant women, and some only for women or families with children.  Still others, such as the Rescue Mission in Tustin, require participation in sectarian worship as a condition of receiving services.  Most have a blanket prohibition on pets other than registered service animals despite the fact that federal and state Fair Housing laws apply to public and private shelters and, with federal and state disability protections, require that emotional assistance animals be allowed as a reasonable accommodation.

44.    For example, the Salvation Army Hospitality House in Santa Ana is listed in the Housing Element of most of the cities in Orange County as a resource for each city's unsheltered population.  This facility offers only 25 beds for transitional housing and 25 beds for emergency shelter, all for men.  To stay there, a man must be able-bodied and employable.  Service animals are admitted only with federal paperwork.  No emotional assistance animals are allowed.  Attendance is required at a pre-dinner meeting that includes a sectarian religious service with prayer.  Clients must arrive between 3:30 and 5:00 p.m.  Men seeking admission must arrive by 3:30 in the afternoon to enter a lottery for any available emergency shelter beds.  If not selected, they can wait until 5:00 to see if a man who is already approved missed curfew. There are almost always more applicants than beds. In January 2018, between 2 and 12 lottery beds were available nightly.

45.     Another shelter, Colette's House in Huntington Beach, is open only to women and children.  In this six-month transitional program, women are required to have a job and work 32 hours per week.  No animals are allowed.  Colette's House is a small shelter and is usually at capacity.

46.     Friendship Shelter operates the Alternative Sleeping Location (ASL) in Laguna Beach in South County.  The shelter has only 45 beds, all of which are usually filled each night.  In addition to the ASL, Friendship Shelter operates a second facility in Laguna Beach that is a 60-day self-sufficiency program.  According to Friendship Shelter's website, the 32-person facility always has a waiting list and is only available to individuals who are able to work.

47.     The Rescue Mission in Tustin is one of the larger private shelters in the County, with approximately 200 beds available.  However, it requires persons to submit to an intensive Christian religious program as a condition of receiving services.  In addition, the Rescue Mission does not permit individuals to bring in certain prescriptions containing opioids which are commonly prescribed for mental health conditions, especially panic and anxiety disorders. This leaves people with lawful medical prescriptions at risk of psychological deterioration and, in some cases, has produced suicidal ideation from the sudden and complete withdrawal of prescribed medications.  Individuals are not allowed to have assistance animals other than registered service animals.

**The Duty to Provide Housing and Shelter**

48.     1982, the California Legislature passed the California Housing Accountability Act.  California Government Code § 65589.5.  Formerly known as the Anti-NIMBY law, the statute bans discrimination against housing for lower-income households.  The legislature declared that the provision of housing for all Californians is a "priority of the highest order." §65580.

49.     Pursuant to this statute, every city and county is required to adopt a General Plan governing the use of land and development projects in its jurisdiction.

18

One of seven mandatory components to the General Plan is a "housing element," that must be addressed and approved by the State of California's Housing and Community Development Department ("HCD"). The Housing Element is prepared every 10 years, with updates in between. Submission to, and approval of, the Housing Element by HCD is a necessary prerequisite for local governments to qualify for public funding for various development programs.

50.    Each local entity must act consistently with its General Plan and housing element. All land use decisions, zoning codes, the General Plan and all other ordinances and policies affecting land use must be consistent with the housing element. §65580.5, §65860. All local land-use decisions, including site specific plans, must be consistent with the adopted General Plan. §65454.

51.    In 2007, the Legislature reiterated its intent to provide for the needs of residents of all income levels and special communities, including seniors, disabled persons and individuals experiencing homelessness, when it passed Senate Bill 2 (SB2). SB2 extended the protections of the 1982 Housing Accountability Act to emergency shelters and clarified that it also covers transitional and supportive housing. This measure imposed increased requirements on cities and counties for low-income housing, emergency shelters and transitional/supportive housing. Each city and county must evaluate its need for shelters and provide a comparison to available facilities to address the identified need. The need for emergency shelters must be assessed annually and seasonally. §65583(a)(7). On information and belief, none of the defendants has complied with this requirement.

52.    Each entity must also designate at least one location where a year-round shelter may be operated without further approval by the local government. The shelter must have sufficient capacity to meet the entity's entire local need for emergency shelter. The designated location may then be used by right, subject only to reasonable zoning restrictions. On information and belief, none of the municipal defendants has fully complied with this requirement.

53.    The express legislative intent of SB2 was to expand the Housing Accountability Act to prevent local entities from denying a proposal to create an eligible facility if it is needed and otherwise consistent with the locality's zoning and development standards.  Recognizing the NIMBY-ism the statute was enacted to combat, the Legislature expressly prohibited the ability of local entities to impose hurdles such as "a conditional use permit or any discretionary" approval from the local government.  §65583(a)(4)(A).

54.    The statute enumerated factors that may be imposed on a proposed facility. These include, but are not limited to, the number of beds or persons served, off-street parking restrictions, outside lighting, etc.  §65583(a)(4)(A)(i)-(viii). However, the local entity has the burden to establish that any restrictions imposed on a proposed facility, as well as any permit processing standards applied, are objective and directly advance the creation of emergency shelters.  If the local entity has an existing shelter that satisfies the statute's intent, a conditional use permit or similar prerequisite may be required to open a new shelter in the same community. The Housing Accountability Act provides that an entity shall not "disapprove" a proposed emergency shelter unless it makes written findings, based on substantial evidence, that one of five exceptions are met. §65589.5(d). The allowed exceptions are: (I) the jurisdiction has met or exceeded the need for emergency shelter identified in its housing element; (2) the project would adversely impact the public health or safety in a significant, quantifiable, direct and unavoidable way that cannot be mitigated; (3) denial is required to comply with specified state or federal law and there is no way to comply without rendering the shelter project infeasible; (4) the shelter is proposed on land zoned for agriculture or resource preservation; and, (5) the shelter is inconsistent with both the zoning ordinance and general plan land use designation (but this reason is not allowed if the city failed to identify the mandated "by right" zones, or that its zones have sufficient capacity to accommodate the need and failed to demonstrate that the

zones can accommodate at least one emergency shelter). §65589.5(d)(l)-(5).  On information and belief, Plaintiffs allege that this requirement has not been met.  It certainly was not met by the County when the BOS proposed three locations in South County for emergency shelters to respond to the closure of the Riverbed and Civic Center encampments, only to withdraw the proposal in the face of community pressure fueled by former Supervisor Todd Spitzer but in direct violation of Government Code §65589.5(d)(l)-(5).  Local entities may satisfy the mandate of SB2 in several ways.  Jurisdictions that are successfully implementing a supportive housing program model under the entity's 10-year plan to End Chronic Homelessness are credited for supportive housing units created under the 10-year plan if the entity can demonstrate that the units are identified in the 10-year plan and are either currently vacant or have all funding needed to construct the units during the planning period.Local entities may also meet the requirements of SB2 by entering into a multi-jurisdiction agreement provided that any emergency shelter will be opened within two years of the start of the planning period.  Gov. Code §65583(d)(1). Entities involved in a joint project must adopt an agreement which, among other conditions, assigns a portion of the new shelter to each jurisdiction.  Specifically, the agreement "shall allocate a portion of the new shelter capacity to each jurisdiction as credit toward its emergency shelter need …" §65583(d)(1)(2).  Also, the housing element for each participating local government must set out the following: the method for allocating bed capacity for the shelter; how the jurisdiction's emergency shelter need is met by the proposed facility; the amount of the financial contribution each entity will make for the development, operation and ongoing management of the shelter; the amount and source of money to be contributed to the shelter; and, finally, that the aggregate total capacity claimed by each participating entity in its housing element is not greater than the total beds available at the shelter.  § 65583(d)(1)(3)(A)-(C).  In other words, if several cities enter in a multi-jurisdiction agreement for a 200-bed

shelter, they may not each claim all 200 beds as evidence that they have complied

with the mandate to provide shelter resources. There is no such agreement in

existence involving any City in South County that would satisfy this alternative.

On information and belief, the ASL in Laguna Beach receives no funding from any

other City and, by priority, serves Laguna Beach residents first.  The City has

enacted admission policies to determine whether an individual has sufficient ties to

residency in Laguna Beach to qualify for admission and services at the ASL.

Persons who do not meet these standards are turned away or required to wait and

see if there is an empty bed on any given night not claimed by a qualified resident

of Laguna Beach. Nearly every city in the County and the County currently rely on

the same shelters to demonstrate that the they are meeting the need for emergency

shelter identified in each entity's housing element.  Because each housing element

lists the same facilities, most of which are in Santa Ana or Anaheim, there is no

possible way that most local entities in Orange County can show they meet the

need for emergency shelter identified in their housing elements.  Thus, most, if not

all, of the local entities in Orange County are in violation of the requirements of

the Housing Accountability Act, as amended by SB2.

**The County's Efforts to Open Additional Shelters**

55.    In its General Plan, the Defendant County states it is proactive in

responding to the needs of the homeless population.  When the County prepared its

2013-2021 General Plan, there was only one small emergency shelter located in the

unincorporated area of the County – American Family Housing in Midway City,

with a maximum capacity of 20 persons.  Recognizing the significant shortfall

between available and needed emergency shelter, and to encourage additional

shelter facilities, the County amended its Zoning Code to allow shelters by-right in

the commercial and industrial portions of the Housing Opportunities Overlay Zone.

This added 177 acres that meet the requirements of SB2 as locations that are

served by transit and other critical resources and available for additional emergency shelters.

56.    Over the course of the past several years, multiple cities in the County, including Fullerton, Irvine, Huntington Beach and Laguna Niguel, have blocked the County's plans to locate new emergency shelters in their communities for reasons other than those allowed by the Housing Accountability Act.  In each instance, the cities acted based on NIMBYism and failed, completely, to provide any justification for the denial that complies with the requirements of SB2.

57.    In 2013, the County identified two locations as potential sites for emergency shelters.  The first was in Santa Ana.  Although the city originally approved the County's proposal, its approval was rescinded after community objections. The County then identified a location in Fullerton in a commercial site. The County BOS approved the purchase of the site in early January 2013.  Two years earlier, following the killing by Fullerton Police of Kelly Thomas, a mentally ill homeless man, Fullerton created a homelessness task force.  The task force issued a report in 2012 with eight recommendations, one of which was to establish a year-round emergency shelter in the City in partnership with the County. To date, that has not happened.

58.    Instead, when the County proposed a location in the city for the first emergency shelter in the area, Fullerton asked that the project be delayed to allow the City to review it further.  Ultimately, based on objections by the community, the City blocked the shelter, resulting in a lawsuit against the City by non-profit groups.  The lawsuit alleged that the City's actions violated Government Code § 65589.5.  Last fall, the Fullerton City Council has again rejected a proposal to create a shelter in the city, concluding first that it was "too soon" to make the decision and then, after a local election was completed, rejecting the proposal.  The City has now committed financial support to two new shelters in the Northern SPA, both located in other cities.  In addition, as a condition of opening the winter

emergency shelter at the Fullerton Armory, the City has required that admission to a winter emergency shelter be by referral only.

59.    After losing out on the initial Santa Ana and Fullerton sites, the County then identified the former bus terminal in Santa Ana as the location for the first – and only – year-round, low-barrier emergency shelter in the County.  The shelter opened in 2016 with approximately 250 beds, but soon rose to over 400 individuals sleeping there each night, evincing the undisputable demand for shelter among people experiencing homelessness in Orange County.  The Courtyard shelter continues to operate at or slightly above the number on a nightly basis, limited only by orders of the District Court restricting a higher capacity because of the challenges overcrowding presents to a service population experiencing multiple disabilities.

60.    One goal of the Courtyard was to provide a place where people encamped in the nearby Santa Ana Civic Center could go.  Because of the desperate need throughout the County for emergency shelter space, people from other communities soon filled the beds and the Civic Center encampment continued for nearly two more years, until the Court ordered it disbanded in March 2018.

61.    With the relocation a year ago of more than 750 unsheltered people living at the Riverbed and the Court's order to dismantle the Civic Center encampment, the County Board of Supervisors voted to approve three additional locations for short-term emergency shelters while it developed and implemented a long-term plan for addressing homelessness because the beds at the Courtyard and Bridges, a referral-only facility in Anaheim, were full.  The vote to approve additional sites occurred in late March 2018.  Each proposed site was on County-owned land in an SB2 zone.  Three locations were announced: Irvine, Huntington Beach and Laguna Niguel, all in South County.

62.     Immediately after the County vote, all three cities objected vigorously, ultimately forcing the BOS to rescind the vote.  Irvine transported nearly 600 people by chartered bus to the BOS meeting where the proposal was ultimately withdrawn.  The City sued the County, raising claims of Brown Act violations in the site approval process and characterizing the planned emergency shelter as a "public nuisance."  At the same time, Irvine touted its affordable housing work.  But, affordable housing is not a substitute for housing for homeless persons as required by State law by Government Code § 65530 et seq., the Housing Accountability Act and SB2.  None of the three proposed cities has an emergency shelter in its geographic boundary, as Irvine implicitly conceded in its lawsuit touting only its efforts to include "affordable" housing.  The shelter resources each City lists in its Housing Element are in other cities or restrict services based on employability, gender, pregnancy status, families with minor children and other categories.

63.     The November 2016 list of Emergency Shelters and Housing Programs available on the website of South County Outreach documents the lack of facilities in this region specifically and the County generally.[11]   Approximately three dozen resources offer housing for unsheltered families, women with children, pregnant women, single women and domestic violence survivors. Many, if not most, of these are private facilities run by religious groups.  Some of these programs have prerequisites to admission, such as a $300 fee or a referral from an emergency shelter program.  There are only seven facilities that accept single men. Of these, some allow only a one-night stay, others limit a stay to 14 days, while still others require that a person be employable.

_____

[11] www.sco-oc.org/wp-content/uploads/2014/05/Shelters.pdf

64.    The South Coast Outreach list of Emergency Shelters and Housing Programs is the same list that nearly every entity puts forward.  Irvine's Housing Element illustrates this point.  In its most recent Housing Element Appendix D: SB2 Compliance Sites Inventory, Irvine reported that its share of the regional unsheltered homeless persons was estimated to be 2,280 people, which Plaintiffs believe may be an error in the Housing Element.  City of Irvine Housing Element, Appendix D-1.   At a minimum, Irvine has responsibility for more than 100 unsheltered persons.  Yet, there is no facility for homeless individuals in the entire city.

65.    Irvine identified Families Forward as its primary provider.  On information and belief, based on a review of the Families Forward website, Plaintiffs allege that this organization cannot satisfy Irvine's SB2 mandate. Families Forward does not provide emergency services.  Applicants must include a minor child and go through a review process.  Families Forward's website acknowledges that it does not provide emergency aid and advises individuals in need of emergency shelter to contact OC 2-1-1.  In any event, Families Forward is a relatively small organization that maintains a few apartments throughout Orange County where it places families that meet all of its criteria.  Other than this organization, Irvine's July 2015 Housing Element update lists 13 resources in Santa Ana and other cities.[12]   These include the Salvation Army facilities in Santa Ana and Tustin, and a number of entities that only offer service referrals.

66.    The only actual significant *housing* listed which is located in Irvine is the Irvine Inn, categorized by the City as "Homeless Services Facilities Serving Irvine" and described as a "192-unit Single Room Occupancy (SRO) facility."[13]  In

---

[12] "Homeless Facilities Serving Irvine."  City of Irvine 2015 Housing Element Supplement, C-66.
[13] *Id.*

26

early 2018, the Inn's website listed rent for a studio apartment at $548 to $731 a month.[14]  The website contains a cryptic caveat that "income restrictions apply on some apartments." *Id.*  2019 websites show the rent at $855 a month.[15]   For a person working 40 hours a week at minimum wage, this rent is almost 60 percent of after-tax income.  This rent is approximately four times General Relief and nearly 100 percent of government disability income.[16] it is The marketing on the website is directed to students at UCI and Irvine Valley College.  It is highly unlikely that the Irvine Inn meets the City's obligations to provide shelter for homeless persons.

67.    The current Irvine Inn website states that its waiting list for apartments is closed until further notice.  Moreover, the Inn as an absolute "no pets" policy, which is likely unlawful under federal and state Fair Housing and disability laws.

68.    Most of the "Homeless Facilities" listed in the Irvine Housing Element Supplement are the same resources on every city's list. Many of these are in Santa Ana, which is approximately seven miles from Irvine.  For a homeless person without a car, the bus ride is at least an hour, with multiple transfers.  For those without funds for a bus ticket, it is a very long walk.  Yet, Irvine residents who attended the BOS meeting were adamant that there is no appropriate place for a shelter in the entire City, despite the requirements of identifying broad swaths of land in the General Plan in compliance with Government Code §65583.

---

[14] https://www.irvineinnapts.com/floorplans.aspx.
[15] *See* https://www.apartmentratings.com/ca/santa-ana/irvine-inn_
[16] *See* https://ca.db101.org/ca/programs/**income**_support/ss_disability/**ssi**/.
California's State Supplemental Payment is $160.72. Combined with the Federal Benefit Rate of $750, this allows an individual a total benefit of $910.72.

69.     In addition to its residents' expressed views that their property values somehow exempt them from the Housing Element requirements, Irvine and Huntington Beach objected to the proposed BOS emergency shelter locations because they are toxic sites, unusable for human habitation.  Neither City offered any other SB2 site to the County and neither City identified any mitigating conditions that could lawfully be required.  Instead, they expressed the position that no emergency shelter was appropriate in their cities under any circumstances.  In filing their 2013 Housing Elements, each represented to the California Department of Housing and Community Development (HCD) that the general locations the County now sought to use were appropriate SB2 sites.

**Liability for Failure to Provide Housing and Shelter**

70.     California Government Code § 815.6 provides that:

> Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

71.     The requirement to provide for housing and shelter for low-income and homeless individuals in the General Plan and to adhere to the requirements of the government code is an "obligatory duty which a governmental entity is required to perform," not a permissive one.  Failure to meet this duty gives rise to liability whether the underlying enactment allows a private right of action or is self-executing.  The term "enactment" includes "a constitutional provision, statute, charter provision, ordinance or regulation." Cal. Govt. Code §810.6.  To date, the County and each Defendant City has failed to meet the mandatory duty created by California Government Code § 65583 *et seq*., known as the California Housing Accountability Act.

## CLASS ALLEGATIONS

72.    The claims set forth in this action are brought by each of the individual Plaintiffs on their own behalf and on behalf of all of those similarly situated putative class members pursuant to Federal Rule of Civil Procedure 23(b)(2).

73.    The Class is defined as:

All persons who are experiencing homelessness in South County and are unable to access a shelter offering a reasonable accommodation for their disabilities, if any.

74.    The members of the class are so numerous that individual joinder of all members is impracticable, if not impossible.  Plaintiffs are informed and believe on that basis that members of the class will exceed 400 in number, which is approximately the number of people experiencing homeless in South County included in the 2017 Point-in-Time Count.

75.    There are common questions of law and fact that predominate over any questions affecting only individual class members in this instance.

76.    Among the common questions of law and fact are the following:

a.  Whether the Defendants, and each of them, have met their statutory duty to provide low-income housing and a continuum of shelter facilities as required by California Government Code § 65589.5;

b.  Whether the Defendants, and each of them, have enforced or threated to enforce policies, practices and customs of citing or arresting people experiencing homelessness for alleged violations of camping, keeping property in public places, loitering and other similar quality-of-life criminal acts when there is no available shelter space;

c.  Whether Defendants, and each of them, through their policies, practices and customs, have failed to address and provide reasonable

accommodation for people with disabilities experiencing homelessness in violation of state and federal statutory rights for disabilities;

d.  Whether injunctive relief restraining further unconstitutional and unlawful acts by Defendants, and each of them, should be ordered by the Court and, if so, the nature of that injunctive relief;

77.    The Class Representatives will fairly and adequately protect the interests of the Class.  They have retained counsel who are experienced and competent in class-action and civil rights litigation.  The Class Representatives have no interests that are adverse or antagonistic to those of other Class members.

78.    A class action is superior to any other method to secure a fair and efficient adjudication of this controversy. As the primary relief sought is injunctive in nature, the burden and expense make it impractical for class members to seek redress individually for the wrongs done to them. The nature and amount of monetary damages sustained by each Class member is very similar in nature and may be established by common proof. Individual litigation by each class member would necessarily burden the judicial system and run the risk of inconsistent judgments.

79.    Plaintiffs are informed and believe and on that basis allege that Defendants, and each of them, have acted on grounds generally applicable to the class, making injunctive or declaratory relief appropriate for the class as a whole.

**PARTIES**

**Plaintiffs:**

80.    Plaintiff **HOUSING IS A HUMAN RIGHT ORANGE COUNTY** ("**HHROC**") is a coalition of entities and individuals working together to achieve supportive, affordable, and permanent housing for homeless individuals in Orange County, with appropriate and adequate wrap around services as needed.  The participants in **HHROC** go to where they understand unsheltered individuals to be

and provide much-needed support that the County of Orange, cities and
municipalities fail to provide.   This includes, but is not limited to, creating
community through preparing and sharing meals, collecting and distributing
clothing; assist with making appointments and transporting individuals to
doctor/dentist, DMV, Social Services, and veterinarian appointments.  They
provide this assistance throughout County, including in South County.

81.    The members of **HHROC** expend their own funds to provide this
assistance, including purchasing food and other items needed by persons
experiencing homeless.  The members of **HHROC**, and each of them, pay taxes to
the County of Orange when they make these purchases.  On information and belief,
each of the municipal Defendants receives funds derived from the payment of
taxes to the County.  Because of the lack of adequate shelter for people
experiencing homeless in Orange County, including in South County, **HHROC** is
required to shift and expend resources to providing immediate direct services, as
described above, and redirected its time and money from its primary focus of
achieving supportive, affordable and permanent housing for people experiencing
homelessness in the County.

82.    Plaintiff **ORANGE COUNTY CATHOLIC WORKER** ("**OCCW**")
operates a community at Isaiah House in Santa Ana.  In furtherance of its mission,
Isaiah House of the Orange County Catholic Worker has served poor people
with dignity since 1987, providing meals, shelter, food, clothing, showers, and
emergency assistance to homeless persons throughout the area.  In addition,
**OCCW** has provided emergency housing to individuals without shelter options.
They are frequently called by the Public Defender and the County Jail in Santa
Ana to provide shelter to homeless women who are arrested and prosecuted for
alleged crimes.   Over the past year and presently, **OCCW** has provided shelter
to women from South County.  Currently, **OCCW** is providing shelter to
women who have been forced to relocate to Santa Ana because of the lack of

1  appropriate local options, if any, in Irvine and San Juan Capistrano.   sIn the
2  past year, **OCCW** has also housed other women from South County cities when
3  they could not find shelter locally.

4     83.    Plaintiff **EMERGENCY SHELTER COALITION OF SAN**
5  **CLEMENTE ("ESC")** is now, and at all times since its incorporation on July 30,
6  2018 was, a non-profit organization under the laws of the State of California.  The
7  members of the **ESC** share a common goal to establish a year-round emergency
8  shelter and resource center in San Clemente to provide people experiencing
9  homelessness with a safe place to sleep, engage in fundamental daily life activities
10 and obtain counseling and referral services. The members of **ESC** include
11 individuals who are residents of, employed in, or recreate in the City and who
12 devote their time and resources to assisting persons experiencing homelessness in
13 San Clemente, regardless of the reason.  Because of the lack of resources
14 throughout South County, **ESC** and its board members provide assistance to
15 persons experiencing homelessness in the region.  Because of the lack of services
16 throughout South County, the **ESC** provides assistance to individuals experiencing
17 homelessness not only in San Clemente, but almost every city in South County,
18 including numerous unsheltered individuals from San Juan Capistrano, Dana Point,
19 Mission Viejo and other cities that have similarly failed to provide assistance to
20 unsheltered individuals in their respective communities in South County.

21     84.    Beginning in or about 2014, **ESC** was engaged in litigation with the
22 City of San Clemente to compel the City to bring itself into compliance with its
23 statutory duties under Government Code §65588(e) to adopt an updated Housing
24 Element that (1) establishes at least one zone in which emergency shelters are
25 permitted by right without any discretionary approvals by the City; (2)
26 demonstrates adequate capacity to meet the City's need for emergency shelter; and
27 (3) promulgates standards designed to encourage and facilitate the development of
28 emergency shelters in appropriate locations, including at least one year-round

facility.  In August 2016, the Hon. Robert J. Moss of the Orange County Superior Court entered judgment in favor of **ESC**, directing the City to revise its Housing Element to conform to its statutory obligations.

85.    The City has a legal obligation to address how it would provide for the needs of homeless individuals in the 2013 Housing Element submitted to the California Department of Housing and Community Development ("HCD") as a statutory condition of approval of the City's General Plan.  Despite the success of the ESC's litigation, the City has still not met its responsibilities.  The City first created and limited the Emergency Shelter Overlay Zone to the local Business Park.  The City knew or should have known that this proposed location did not meet the requirements under SB2 because, among other bases, the Business Park is located miles away from the City's downtown area, is not served by public transportation, and is composed of very expensive buildings not conducive to a shelter.  **ESC** continues to work toward developing a shelter in the Emergency Shelter Overlay Zone identified as a result of the successful litigation by **ESC.**

86.    Plaintiff **DUANE NICHOLS** is a 60-year-old veteran who is homeless in San Clemente.  He is eligible to upgrade his original "Other than Honorable" discharge.  He has no income at present.  Because of his significant disabilities and the distance involved, he is unable to get to a County office to apply for General Relief or any other form of public assistance.

87.    Over the course of the past six months, he has been contacted a few times by Mercy House, the contract services outreach agent for San Clemente.  The primary assistance offered by Mercy House was an offer to transport Mr. Nichols to the Courtyard in Santa Ana or the ASL in Laguna Beach.  OCSD deputies threaten him with jail if he does not go to a shelter, but neither the Courtyard or the ASL are viable options because both are generally at or over capacity every night, with people sleeping on the sidewalks around the facilities.  Both require a referral for admission or give priority to local residents.  During one recent rain storm,

Mercy House came with law enforcement and offered motel rooms with two people in a room for two nights only. When Mr. Nichols arrived at the motel, he learned that there were 4 people in a very small room and that they would only be sheltered for one night, returning him to the streets.

88.    Mr. Nichols is physically, medically and visually disabled. He uses a tricycle for mobility assistance. Recently, a medical professional accompanied the outreach workers from Mercy House. Although Mr. Nichols was offered medical medical assistance, in order to do so he is required to check in at the Family Assistance Ministries ("FAM"). His compound disabilities make it difficult, if not impossible, for him to get to the FAM location. He suffers from COPD, blood clot issues, hip problems, limited vision and severe arthritis. Moreover, he fears losing his property because he has no place to leave his property when he goes to FAM and cannot transport it with him. With great difficulty, he has made the trip to FAM several times to check in with a FAM caseworker but is repeatedly told only to come back in two weeks.

89.    Mr. Nichols sleeps in the parking lot at the train station. On many nights, he is awakened by sirens as deputies arrive and threaten him with arrest if he does not leave. He has been ordered by OCSD personnel to leave the City.

90.    Plaintiff **DARREN JAMES** is disabled and homeless, living in San Clemente. For about two years, he has stayed in the same area but over the past several months, law enforcement have rousted him in the middle of the night, telling him to move or be arrested.

91.    Until about two years ago, Mr. James kept his belongings in a storage unit. At that time, he had income from SSI. When his SSI was terminated unexpectedly, he could no longer pay for the storage unit and thereafter kept everything he owned with him. He always leaves his property neatly packed. In early February 2019, all of his possessions were taken from the location where he left them daily for two years. He approached a person in the area that he

understood to be a City employee, asked about his possessions, and was informed that the City did not retain the property.  Mr. James lost everything he owned, including his sleeping bag, blankets, cowboy boots he had had since he was a child and other sentimental items and family pictures, his birth certificate, and all of his personal papers.

92.    Like Mr. Harris, in the last three or four months, law enforcement approached Mr. James at night, woke him up and told him that he had to move or face arrest.  On information and belief, he understands that he is being threatened for sleeping in public, even though there are no shelter beds available in South County to accommodate him.

93.    Plaintiff **BRUCE STOVALL** grew up in Irvine and it was his primary residence until the family home was sold after his mother's death. Presently, he sleeps outdoors in Irvine.  When it rains, he seeks shelter under a building overhang.  He has a congenital heart defect that makes it hard for him to breathe and limits his mobility.  As a consequence, he has circulatory issues that cause his feet to swell, compounding his mobility issues.  It is hard for him to manage these health conditions without shelter, and the stress of being unsheltered is damaging to his heart condition.

94.    In addition **MR. STOVALL** has other disabling conditions, including a hip problem and herniated disks in his neck.  All of these infirmities make it very difficult for him to walk without leaning on a shopping cart.  He has been approved for hip replacement surgery but cannot recuperate while living on the street.

95.    Mr. **STOVALL** has friends in Irvine who help him with the tasks of daily living.  His doctors are also in the vicinity.  Even if he could get into the Courtyard, he would not have anyone to help him with his physical mobility issues and could not navigate the travel from there to his doctor's appointments.

**Defendants:**

96. Defendant **ORANGE COUNTY** is a government entity with the capacity to sue and be sued.   The Board of Supervisors is the governing entity for the County. The Board of Supervisors is responsible for developing and implementing the General Plan, including addressing the need for housing and shelter for low-income and homeless individuals.  The departments of the COUNTY include the Orange County Sheriff.  Employees of the COUNTY have engaged in the acts complained of herein pursuant to the policies, practices and customs of the COUNTY.

97. The OCSD is the contract law enforcement entity for 13 cities in the County, most of which are in South County, including but not limited to San Clemente.  The OCSD has engaged with homeless individuals in contract cities and enforced local ordinances in those jurisdictions that mirror the ordinances criminalizing homelessness in the Defendant County and cities.  The OCSD has also applied and threatened to apply the County's "quality-of-life" ordinances to compel members of the Plaintiff class to move from public spaces when they have no other place they can lawfully be.  In each of the defendant municipalities, law enforcement has made it clear that homeless persons are not welcome in the city, their mere presence is a crime, and they will be ticketed or arrested if they remain.

98. Defendant **IRVINE** is a government entity with the capacity to sue and be sued.  According to the 2017 PIT, the City of **IRVINE** had 199 people experiencing homelessness, nearly two-thirds of the total of 286 unsheltered individuals counted in the 2017 PIT.  The departments of the City include the Irvine Police Department.  Employees and elected officials of **IRVINE** have engaged in the acts complained of herein pursuant to the policies, practices and customs of the city.  The actions of the City of **IRVINE** are described more fully above, including the blockage of any emergency shelter in the City.

99. Defendant **ALISO VIEJO** is a government entity with the capacity to sue and be sued.  Employees and elected officials of **ALISO VIEJO** have engaged

in the acts complained of herein pursuant to the policies, practices and customs of the city. The City has failed to meet its obligations to provide for the needs of homeless individuals in the City. In its 2013 Housing Element, the City provided minimal information on how it would address the needs of homeless individuals in its community. Instead, the City relied on Orange County Housing Authority (OCHA) rental assistance programs and Shelter Plus Care for homeless individuals with significant disabilities. 2013 Aliso Viejo General Plan H-13. In addition, the City identified $13,500 expended over eight years to Laura's House, a domestic violence organization serving all of Orange County. The City also identified $29,340 spent over an unidentified period of time to South County Outreach, which provides crisis food and funding, mostly for housed individuals. The City's Housing Element did not identify a single shelter or a by-right location for a shelter in the City to meet the needs of persons experiencing homelessness in Aliso Viejo. On information and belief, Plaintiffs allege that the City of Aliso Viejo has not amended its Housing Element as it addresses the special needs of homeless individuals, despite the requirement to provide periodic amendments and despite the fact that 28 individuals who identified Aliso Viejo as their last residence were served by the ASL in Laguna Beach in 2017.

100. Defendant **DANA POINT** is a government entity with the capacity to sue and be sued. The departments of the City include the Dana Point Police Department. Employees of the City have engaged in the acts complained of herein pursuant to the policies, practices and customs of the city. The City has failed to meet its obligations to provide for the needs of homeless individuals in the City. On information and belief, Plaintiffs allege that the City is the enforcement agency for individuals cited by State Park Rangers for camping on the beach area in Dana Point. In that role, Dana Point continues the prosecution of homeless persons cited in the City for violating state laws prohibiting camping in public.

101.    Defendant **SAN JUAN CAPISTRANO** is a government entity with the capacity to sue and be sued.  Employees and agents of **SAN JUAN CAPISTRANO** have engaged in the acts complained of herein pursuant to the policies, practices and customs of the CITY.  The City has failed to meet its obligations to provide for the needs of homeless individuals in the City.  On information and belief, Plaintiffs allege that the City has failed to identify an appropriate by-right shelter location and has, in fact, rejected every suggestion of a potential location by community groups serving homeless individuals in the City. At the same time, the City has threatened homeless individuals in its jurisdiction with citation and arrest if they remain in public places, forcing many people into remote areas where they cannot readily obtain any assistance.  The City is more than 20 miles from Santa Ana and Anaheim, even if the City could somehow shifts its mandatory obligations to already concentrated numbers of shelters in those two cities. Because of the lack of services in the City, persons experiencing homelessness in San Juan Capistrano travel to San Clemente to receive assistance from Plaintiff **ESC**.  Some of the members of **ESC** also provide essential services to people experiencing homelessness in San Juan Capistrano.  In addition, Family Assistance Ministries provides some resources in San Clemente, Laguna Beach and Dana Point, but none of this involves housing for unsheltered individuals since all of their facilities are restricted to families with children.

102.    The Defendant **CITY OF SAN CLEMENTE** is a government entity with the capacity to sue and be sued.  The Orange County Sheriff's Department is the contract law enforcement agency, acting as employees, for the City, charged with enforcing City law within its geographic boundaries.  One department of the Defendant City is the San Clemente Maintenance Department.  Employees of the City have engaged in unlawful activity, taking property without notice that they know or should know is the essential property of unsheltered homeless individuals in San Clemente, who have no to leave their property during the day while they go

to services, work and attend to other daily tasks. Although the OCSD has stopped arresting homeless individuals for quality-of-life violations, deputies continue to threaten citation or arrest if homeless people do not leave public spaces where they have a constitutional right to be and remain.

103. The **CITY OF SAN CLEMENTE** was previously sued by the organizational Plaintiff ESC based on the City's failure to comply with the mandatory requirements of Gov. Code §§65583 et seq., in that the City failed to identify any site within the City that met the requirements of state law to allow operation by right of a shelter serving homeless individual without additional governmental restrictions on the entity. The Orange County Superior Court enjoined the City from approving any development plans until it was in compliance. Although the City then identified a zone where a shelter could be located and operated by right, the property was, in fact, not feasible and the City knew or should have known that. At present, there is no location in the City that is approved and meets the requirements of §§65583 et seq. The City has rejected every proposal by the Plaintiff ESC to identify a location for a shelter in the City.

104. Over the past several months, the **CITY OF SAN CLEMENTE,** through its employees and agents, has fostered a climate of fear directed at people experiencing homelessness in the city. Homeless individuals have been barred from locations where they previously stayed, largely out of sight. They were told by the OCSD, the contract LEO for San Clemente, that they not be at the train station except limited purposes, could not stay at the beach or a public grassy area where they had stayed, and other similar relocations every time they moved. They have been forced into more public spaces where they have become the target of residents virulently opposed to the presence of homeless individuals. For example, as part of a concerted campaign to force homeless individuals out of public view and out of the city, several individuals have parked their trucks in such a manner as to have the fumes from the exhaust blow in the direction of homeless individuals

on public sidewalks, where they have a right to be under *Martin v. City of Boise* in a municipality that lacks any shelter beds. These individuals have left their trucks running to maximize the toxic impact of the engine exhaust. Others have made it a point to transit the sidewalk with wheelchairs, challenging ADA compliance. Some, if not most or all of the individuals are able-bodied as evinced by the fact that these individuals are observed rotating who is being pushed and who is sitting in the wheelchair. Still others scream at the homeless individuals in public spaces while law enforcement does nothing.

105. Each of the Defendants, their employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs. Each acted in concert with each other. The Defendants developed and implemented a coordinated plan to increase enforcement actions against the homeless community in the Riverbed and surrounding cities. The challenged acts caused the violation of Plaintiffs' rights.

106. The identities and capacities of defendants DOES 1 through 10 are presently unknown to plaintiffs, and on this basis, Plaintiffs sue them by fictitious names. Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE defendants when ascertained. Plaintiffs are informed, believe, and thereon allege that DOES 1 through 10 are, and at all times relevant herein were, employees and/or agents of the Defendant COUNTY and Defendant CITIES and are responsible for the acts and omissions complained of herein. Defendants DOES 1 through 10 are sued in their official and individual capacities.

**FIRST CAUSE OF ACTION**
**Violation of Eighth and Fourteenth Amendments (42 U.S.C.§1983)**
**(Against All Defendants)**

107.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

108.    The acts and omissions of Defendants, and each of them, as described herein, violate the constitutional rights of Plaintiffs to be free from actual or threatened cruel and unusual punishment.  By virtue of their status as homeless and disabled, and the absence and insufficiency of shelter or housing in South County, Plaintiffs have no way to comply with the laws Defendants have sought and continue to seek to enforce against them.

109.    Plaintiffs further allege that it violates their substantive due process rights to threaten them with citation and arrest for sleeping and keeping their property in public places when there is inadequate shelter available.  The Defendants, and each of them, lack adequate and appropriate shelters to provide a safe place for the Plaintiff class to sleep and simply be.  Instead, Defendants enforce "quality-of-life" violations and expect members of the Plaintiff class to move out into neighboring cities, in which similar ordinances prevent them from lawfully residing without shelter, having their property in public places, and loitering laws prohibit their mere presence in these jurisdictions.

110.    The citation and threats of citation for behavior such as sleeping in or keeping personal property on public space when there is inadequate shelter available violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 7, §17 of the California Constitution.

111.    Each Defendant has a custom, policy, and/or practice of encouraging its officers, employees and agents to threaten citations and arrest of homeless persons for the unavoidable behavior of sleeping or having property in public based on their unhoused status.

112.    There is an actual controversy between Plaintiffs and the Defendants concerning the threat of citation if Plaintiffs remain and sleep on public property with their personal possessions when they have no alternative location to be that

will not violate Defendants' laws.   Plaintiffs desire a judicial determination of their rights and duties and a declaration as to Defendants' constitutional obligations.

## SECOND CAUSE OF ACTION
### Violation of First and Fourth Amendment; 42 U.S.C. 1983
### (Against All Defendants)

113.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

114.   On information and belief, each of the Defendants, through their employees and agents, ordered individuals in their respective jurisdictions who appear to law enforcement to be homeless to move along from public places where they have a right to be pursuant to the First Amendment.  The detentions and interrogations constitute an unlawful seizure as they were done without reasonable suspicion or probable cause to believe that the individual had or was about to commit a crime other than a purported violation of a law necessitated by their status as homeless individuals plus the lack of available shelter.  Plaintiffs, as everyone else, have a First Amendment right to be present in a public space, to "loiter" in a public space for no reason and to not be excluded from that space by threat, intimidation or coercion for alleged crimes directly related to their status as individuals experiencing homelessness who have no place to live other than in public spaces.

115.   As a direct consequence of Defendants' past and threatened future actions, Plaintiffs have suffered and will continue to suffer a violation of their constitutional rights.   Plaintiffs have suffered damages in the form of pain and suffering as a result of Defendants' policies, practices and customs.

## THIRD CAUSE OF ACTION
### Right To Due Process Of Law; 42 U.S.C. § 1983; Fourteenth Amendment
### (Against All Defendants)

116.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

117.   The due process clause of the Fourteenth Amendment prohibits government officials, and those acting in concert with them as their employees and agents, from depriving persons of their rights without due process of law.

118.   In addition, Plaintiffs' right to due process of law was violated by each of the Defendants through the application of constitutionally vague laws used to threaten intimidate, and coerce Plaintiffs to leave public space to avoid citation or arrest for, *inter alia*, "camping" in public, loitering, and placing their possessions on public property when they have no other place to engage in daily life activities.  Defendants' laws violate the Fourteenth Amendment because they are so vague as to be impossible to comply with.   Provisions similar to the Defendants' loitering ordinances listed above have been repeatedly found unconstitutionally vague and overbroad in the past.

119.   The acts and omissions of Defendants, as described herein, violate the constitutional rights of Plaintiffs under the Due Process Clause of the United States Constitution.  The wrongful conduct complained of herein was the product of the policies, practices or customs of the Defendants, and was not the product of accident or inadvertence, and was not random.  In so doing, Defendants were deliberately indifferent to the rights of Plaintiffs and the class they represent and acted in willful and reckless disregard of the rights of Plaintiffs and the class.

120.   Plaintiffs allege that the failure and refusal of the Defendants, and each of them, to comply with the mandatory duty to provide for the needs of the class members to stay where they are protected from the adverse weather elements, puts them in immediate danger and constitutes a state-created danger to a community that predominantly suffers from one or more significant disabilities.

121.   As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiffs and the Plaintiff Class suffered injuries in that, in doing the

acts complained of herein, Defendants acted knowingly and with deliberate indifference to their statutory obligations and to Plaintiffs' disabilities and the harm substantially likely to occur to them as the result of Defendants' unlawful policies and practices, including the omission to act. Defendants have accomplished these unlawful acts by using federal and state funds in ways that discriminate against qualified disabled persons.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF 14TH AMENDMENT; SUBSTANTIVE DUE PROCESS; CALIFORNIA GOVERNMENT CODE § 65583 *et seq.*; CALIFORNIA CIVIL CODE § 815.6**

**(Against All Defendants)**

122.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

123.   California Civil Code § 815.6 provides for liability against a public entity when: (1) the entity violates an enactment; (2) the plaintiffs are in the class of persons protected by the enactment; (3) the enactment is intended to protect the type of injury complained of by the plaintiffs; (4) the violation of the enactment is the proximate cause of the injury; and, (5) the public entity did not exercise reasonable diligence in discharging its duty established by the enactment.

124.   An enactment includes a federal or state constitutional provision, a statute, charter provision, ordinance or properly adopted regulation.

125.    The Fourteenth Amendment of the United States Constitution, Article I, § 7 of the California Constitution, California Civil Code § 52.1, and California Government Code § 65583 *et seq.* are all enactments within the meaning of California Civil Code § 815.6. Plaintiffs and the Plaintiff Class are in the class of persons protected by these enactments.

126.   The aforementioned enactments, applied to Plaintiffs separately and together, constitute mandatory duties within the meaning of California Civil Code § 815.6 and were designed to protect against the kind of injuries alleged herein. As described hereinabove, Defendants did not exercise reasonable diligence in discharging their duty established by the enactments identified above to refrain from violating the constitutional and statutory rights of Plaintiffs and the Class. Pursuant to California Government Code.

127.   As a direct and proximate result of the aforementioned acts of Defendants, Plaintiffs and the Plaintiff Class suffered injuries as a direct result of the failure of each of the Defendants to comply with Government Code § 65583 *et seq.* with respect to people experiencing homelessness in their respective jurisdictions.  Plaintiffs are unable to obtain appropriate housing or shelter and are threatened, cited and, in some instances arrested, for living in public places when there is no available shelter or housing, let alone shelter or housing that will provide a reasonable accommodation of their individual disabilities.

128.   Plaintiffs and the Plaintiff Class seek injunctive and declaratory relief and damages for the individual Plaintiffs.   The damages sought by the individual Plaintiffs are incidental to the injunctive relief sought in this action.

**FIFTH CAUSE OF ACTION**
**Violation of Americans with Disabilities Act**
**42 U.S.C. §§ 12132, 12133; 29 U.S.C.  § 794a**
**(Against All Defendants)**

129.   Plaintiffs incorporate and reallege all preceding paragraphs as if fully set forth hereat.

130.   Defendants, and each of them, their agents and employees, have failed to provide for the needs of disabled homeless individuals in their jurisdictions and have, instead, offered services that fail to provide reasonable accommodations to people experiencing homelessness in South County.

131.    By the implementation of their policies and programs, by both commission and omission, Defendants' actions have the effect of subjecting the Plaintiffs and other qualified individuals with disabilities to discrimination based on their disability in violation of 29 C.F.R. § 35.130(b)(3).

132.    Defendants, and each of them, have expended federal and state funds to accomplish their unlawful acts, including funding from the federal and state governments to the County and expended at the County and municipal level.

133.    As a consequence of Defendants' unlawful actions, Plaintiffs and the class they represent have suffered and continue to suffer damages and are entitled to compensation therefore, as well as declaratory and injunctive relief. s

134.    As individuals with disabilities, Plaintiffs are eligible and qualified for programs operated by the Defendant County but cannot access those programs without assistance and reasonable accommodations. The failure of the County is compounded by the failures of the municipal defendants to meet their independent obligations under state law to provide for the needs of disabled and homeless individuals in their respective jurisdictions.

## SIXTH CAUSE OF ACTION
### Violation of California Civil Code § 52.1
### (Against All Defendants)

135.    Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as through fully set forth hereat.

136.    The Defendants' conduct, as described herein, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise and enjoyment of Plaintiffs' rights as secured by the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution or laws of the United States, and of the rights secured by the Constitution or laws of the state of California.

137.   Defendants have engaged in concerted and repeated conduct to cite and arrest Plaintiffs under unconstitutional ordinances, on their face and as applied, and threatened to cite and arrest them repeatedly.  Defendants engaged in coercive and intimidating tactics by conducting unwarranted stops and collecting information on Plaintiffs to push them out of Defendants' respective jurisdictions.

138.   Defendants' actions are the proximate cause of the harm suffered by the individual Plaintiffs, as well as the failure to fulfill the statutory obligation to provide for homeless individuals within their respective jurisdictions, and Plaintiffs are entitled to compensation for their pain and suffering.

139.   Defendants' continued unlawful acts against and affecting the Plaintiffs and the class they represent is ongoing and will continue unless and until the Court enjoins this unlawful conduct.

### SEVENTH CAUSE OF ACTION
### RIGHT TO DUE PROCESS OF LAW; 42 U.S.C. § 1983
### FIFTH AND FOURTEENTH AMENDMENTS; ART. I, § 7
### (By Plaintiff DARREN JAMES against the CITY OF SAN CLEMENTE)

140.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

141.   The CITY OF SAN CLEMENTE, their employees and agents, owed Plaintiff DARREN JAMES a duty under the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, § 7 of the California Constitution to protect the personal property of the Plaintiffs.

142.   Despite this well-defined duty, Defendant CITY of San Clemente provided Plaintiff with no notice that his property was at risk of being seized and/or destroyed and did not act to preserve the property or provide any means of reclaiming it in a timely manner, even though Defendant CITY was put on notice by past court decisions, including decisions at the Ninth Circuit Court of Appeals, that such notice and preservation of property was required.

143.    Plaintiff is informed and believes that the acts of Defendant CITY, and its employees and agents, were intentional in failing to protect and preserve Plaintiff's property and that, at minimum, Defendant CITY was deliberately indifferent to the likelihood that the property would be seized and destroyed without due process based on the past occurrences of these same constitutional and statutory violations of the law.

144.    Defendant CITY OF SAN CLEMENTE seized and destroyed the personal property of the Plaintiff DARREN JAMES without due process, lawful justification, or just compensation.

145.    As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiff DARREN JAMES has suffered loss of his personal property and are entitled to compensatory damages for their property and other injury to their person.

## EIGHTH CAUSE OF ACTION
### Violation of California Government Code §11135
### (Against All Defendants)

146.    Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as though fully set forth hereat.

147.    California Government Code section 11135 provides that:

No person … shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

148.   The Defendants, and each of them, are entities subject to the requirements and prohibitions of section 11135 in that they receive public monies and financial assistance from state agencies and other state funds.

149.   The term "disability" applies to both mental, medical and physical disabilities as defined in California Government Code section 12926.  The Defendants, and each of them, directly and through their contractors and agents, discriminated against Plaintiffs on the basis of their disabilities.

150.   As a direct and proximate result of Defendants' actions, and those of its contractors and agents, Plaintiffs and the Plaintiff Class experienced and continue to experience direct injury, including pain and suffering.

## NINTH CAUSE OF ACTION
## TAXPAYERS' SUIT: DECLARATORY AND INJUNCTIVE RELIEF
## California Code of Civil Procedure § 526a
## (Against All Defendants)

151.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

152.   Plaintiffs, and each of them, have been assessed and are liable to pay taxes in and to the County of Orange.  On information and belief. Plaintiffs allege that the taxes collected by the County of Orange are dispensed to the Defendant municipalities to support various programs and services, including the provision of services to people experiencing homelessness.  Plaintiffs and the class they represent have suffered and, unless the Court restrains Defendants, will continue to suffer irreparable harm.

153.   Plaintiffs are informed and believe, and on that basis allege, that the conduct of Defendants, their employees, agents and contractors, has been and, unless restrained, will continue to be deleterious to the constitutional and statutory rights of Plaintiffs and the general public.  Plaintiffs thereby seek to enforce

important rights affecting the public interest within the meaning of California Code of Civil Procedure § 1021.5.

154.   Plaintiffs have no adequate remedy at law.

155.   Unless the Defendants are enjoined from continuing the unlawful course of conduct for engagement with the Class, Plaintiffs will suffer ongoing and irreparable injury to their rights.  Plaintiffs seek injunctive relief pursuant to California Code of Civil Procedure § 526a and the substantive standards reflected in the claims stated above, for which injunctive and declaratory relief are appropriate remedies.

156.   Defendants have expended public monies and threaten and will continue to spend such monies to implement and engage in the illegal conduct described herein.

157.   Pursuant to California Code of Civil Procedure §§526 and 526a, and the constitutional and statutory provisions set forth above, the Plaintiffs and Plaintiff Class, as taxpayers and as injured parties entitled to relief, seek declaratory and injunctive relief, damages for the individual plaintiffs, and an accounting to prevent continued harm and to protect themselves and the public from the defendants' unlawful policies and practices.  Said damages to the individual plaintiffs is incidental to the injunctive relief sought for the class.

**WHEREFORE**, Plaintiffs pray as follows:

1.   For an order enjoining and restraining the Defendants, and each of them, their employees and agents, from citing or arresting and threatening to cite or arrest individuals for violations of quality of life violations, including but not limited to camping, property or loitering laws application in public spaces in each jurisdiction, no matter how titled, when there is no adequate shelter or other placement available;

2.  For a declaratory judgment that Defendants' policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and federal and state statutory laws identified herein;

3.  For a declaratory judgment that Defendants failed to meet their mandatory duty to provide for shelter and housing for homeless and extremely low-income residents of their jurisdictions, as codified in Gov. Code §§65583 et seq.;

4.  For an order enjoying the issuance of all development permits in the Defendant jurisdictions unless and until Defendants are in full compliance with the Housing Accountability Act , Gov. Code §§65583 et seq.;

5.  For damages to the individual plaintiffs in an amount to be determined according to proof based on their federal claims only;

6.  For costs of suit and attorney fees as provided by law;

7.  For such other relief as the Court deems just and proper.

Dated: May 13, 2019          Respectfully submitted,

LAW OFFICE OF CAROL A. SOBEL
ELDER LAW & DISABILITY RIGHTS CENTER
SCHONBRUN SEPLOW HARRIS & HOFFMAN


_____/s/ Carol Sobel_____
By: CAROL A. SOBEL
Attorneys for Plaintiffs