**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
**ELDER LAW AND DISABILITY RIGHTS CENTER**
1535 E 17th Street
Santa Ana, California 92705
T. 714-617–5353
E. BWEITZMAN@ELDRCENTER.ORG
E. BWISE@ELDRCENTER.ORG

**CAROL A. SOBEL** SBN 84483
**MONIQUE ALARCON** SBN 31165
**LAW OFFICE OF CAROL SOBEL**
725 ARIZONA AVENUE, SUITE 300
SANTA MONICA, CA 90401
T. 310 393 3055
E CAROLSOBELLAW@GMAIL.COM
E. MONIQUE.ALARCON8@GMAIL.COM

**PAUL L. HOFFMAN** SBN 71244
**CATHERINE SWEETSER** SBN 271142
**SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP**
11543 WEST OLYMPIC BOULEVARD
LOS ANGELES, CA 90064
T. 310 396-0731
E. HOFFPAUL@AOL.COM
E. CSWEETSER@SSHHLAW.COM

ATTORNEYS FOR PLAINTIFFS.

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| HOUSING IS A HUMAN RIGHT ORANGE COUNTY, an unincorporated association; EMERGENCY SHELTER COALITION, a non-profit corporation; DUANE NICHOLS, DARREN JAMES, as individuals, <br><br> Plaintiffs, <br> v. <br><br> THE COUNTY OF ORANGE, THE CITY OF SAN CLEMENTE, and DOES 1-4; <br><br> Defendants. | Case No.:  8:19-cv-00388-PA-JDE <br><br> **SECOND AMENDED COMPLAINT:  CIVIL RIGHTS** <br><br> (Filed pursuant to order of the Court) |

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

### JURISDICTION AND VENUE

1.      This is an action for injunctive and declaratory relief and damages for the individual plaintiffs pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the Eighth Amendment to the United States Constitution.  Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on questions of federal law, and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

2.      Venue is proper in the Southern Division of the Central District in that the events and conduct complained of herein all occurred in Orange County.

### FACTUAL ALLEGATIONS

**THE NUMBER OF HOMELESS INDIVIDUALS IN ORANGE COUNTY:**

3.      Orange County has one of the largest homeless populations in the State with nearly half unsheltered.  In 2016, the federal Department of Housing and Urban Development (HUD) reported to Congress a total of 3,028 homeless individuals in the Santa Ana/Anaheim/Orange County Continuum of Care (COC), which put the region at the top of all the smaller regional city/county COC's.  That number increased to 4,792 in the 2017 HUD report to Congress, putting the region's homeless population just 167 people below the state of Hawaii.

4.      The numbers submitted by the County were based on the 2017 Point-in-Time ("PIT") count, which grossly understated the total number of unsheltered homeless individuals in the County, particularly in two of the largest cities, Santa Ana and Anaheim.  In January 2017, approximately 1200 individuals were camped in the Riverbed and almost 500 were camped in the Santa Ana Civic Center.  Just a few months before the January 2017 PIT, Anaheim conducted a census that identified just over 900 homeless individuals in the city, more than twice the number in the 2017 PIT.  Similarly, the OC Health Care Agency conducted a census in late summer 2016 just in the Santa Ana Civic Center and counted 461 individuals.  The numbers of unsheltered individuals in the 2017 Count, by Service Provider Area (SPA) are 936 in the North SPA, 1,362 in the Central SPA, and 286

1

in the South SPA.  As noted, these numbers are likely a gross undercount.

5.      The initial results of the 2019 PIT report approximately 3700 individuals living on the street and in vehicles, up from the approximately 2400 in the 2017 PIT.[1]  In addition, another 1300 people experiencing homelessness were counted at shelters, down considerably from the 2017 PIT.[2]  On information and belief, six shelters were not included in the PIT count in January but will be included in the final totals.  County officials applied in a different process for conducting the 2019 PIT, asserting that the 2019 count would produce a more accurate result.  *Id.*  Many of the volunteers involved in the 2019 count expressed concerns that recent sweeps by local law enforcement dispersed communities of people experiencing homelessness to avoid citation or arrest, calling into question whether the 2019 PIT, like the 2017 PIT, would still result in a significant undercount of people experiencing homelessness in Orange County.

6.      Now the final 2019 PIT has been released and the numbers are devastating.  With a more accurate process than earlier years, the increase in people experiencing homelessness in the County is up more than 42 percent from the 2017 PIT.  While the greatest increases are in the North and Central SPAs, the South SPA cities saw an increase of over 11 percent from the 2017 PIT count, bringing the total of individuals experiencing homelessness in South County to approximately 763 persons.   This number is greater than the 701 year-round emergency shelter beds reported in the 2019 PIT for the entire county.

*///*

_____

[1] Spencer Custodio, *Over 3400 Homeless People on OC Streets, According to Initial Headcount*, VOICE OF OC (Jan. 25, 2019), https://voiceofoc.org/2019/01/over-3400-homeless-people-on-oc-streets-according-to-initial-headcount/
[2] *Id.*

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

**DEATHS OF UNHOUSED INDIVIDUALS IN ORANGE COUNTY:**

7.      The consequences of the county and municipal governments' abdication of responsibility are significant.  Deaths of homeless people in Orange County rose to 210 to 2017, with at least one homeless person dying in nearly all of the 28 cities throughout Orange County.  And although the statistics for 2018 are not yet complete, a recent report released by the Orange County Sheriff's Department found that even more unhoused persons—about 250—died last year.  Based on the currently available numbers, homeless people died last year in all but one of the Defendant cities. The one exception is Aliso Viejo, which has the largest number of individuals who stayed at the ASL in Laguna Beach in 2017 other than residents of the City of Laguna Beach.

8.      In a 2017 interview, CEO and Founder of the Illumination Foundation ("IF"), Paul Leon, stated that his organization alone provided inpatient medical care to approximately 70 individuals who were living on the streets.  Leon's assessment was that 90 percent of that number would otherwise have died if they were still unsheltered and not living in the IF facility with medical support.

9.      Responding to the medical requirements of individuals who are unhoused puts an enormous financial and personnel stress on the public health system.  Individuals "experiencing homelessness have high rates of chronic mental and physical health conditions, co-occurring disorders and barriers to health care and affordable housing."  Am. Pub. Health Ass'n, Policy No. 20178, Housing and Homelessness is a Public Health Issue (Nov. 7, 2017) ("APHA 11-7-17").  According to the HUD Annual Homeless Assessment Report to Congress, 32% of more than half a million people experiencing homelessness on a single night in 2016 were unsheltered.  According to the 2017 Point-in-Time count, half of those experiencing homelessness in Orange County are unsheltered on any night, 50% above the national average.  APHA 11-7-17.

///

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

10.    Individuals experiencing homelessness are already at greater risk of illness than the housed population.   By some estimates, the number is three to six times greater risk of illness for unhoused individuals.   www.nhchc.org/wp-content/uploads/2012/01/Dec2007HealingHands.pdf.

11.    Southern California cities, in particular, often tout the good weather here as a draw for persons experiencing homelessness around the country, even though no statistical evidence supports that assertion.

12.    The County recognizes the serious threat cold, windy and wet weather present to the unhoused. When the National Weather Service issued an alert regarding severe cold temperatures, the County government issued a notice to people to protect their pets from the adverse effects of cold weather, including hypothermia.[3]

13.    Because of the severe winter weather, Orange County opened the Santa Ana and Fullerton armories all day from Thursday, February 14 through Saturday morning, February 16 at 6 a.m., after which the armories will return to limited access hours from 7 p.m. to 6 a.m.  The emergency winter shelter armories are only available in the Central and North Service Provider Areas.  The County has placed no facilities, temporary or otherwise, in the South SPA.

**SOUTH COUNTY SHELTERS:**

14.    The Alternative Sleep Location (ASL) in Laguna Beach is the only low-barrier shelter in South County.  It is a very small shelter, with a capacity of 45 beds in deteriorating trailers. Until recently, it was open only at night.  The facility opened following a settlement in a lawsuit challenging police enforcement of anti-camping laws against homeless individuals in Laguna Beach.

---

[3]https://media.ocgov.com/go/occr/animal/about/newsdetails.asp?News!D+5083.8/TargetID=87

4

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

15.    Until recently, the facility did not open until 6 p.m. and required
people seeking entry to arrive no later than 8 p.m.  The City provided limited free
transportation to and from the facility, which is located in Laguna Beach Canyon.
The shelter closed for the day at 7:30 a.m.  In or around the spring of 2019, a van
service was instituted, providing more opportunities to travel to and from the ASL.

16.    Starting on February 4, 2019, the ASL introduced a pilot program,
"enrolling" clients and, for the broader group of those experiencing homelessness,
opening the shelter on a drop-in basis for showers, laundry, mail, lunch, computer
access and social services from 10 a.m. to 1 p.m.  Under the new program, only
persons enrolled in the new program will be allowed in the shelter from 5 p.m. to
10 a.m. No drop-in services will be offered during these hours.

17.    Those individuals approved for the enrollment program are offered
overnight places at the shelter for 30 days, extendable if the person actively
pursues housing solutions in that time period.  Each enrolled person is assigned a
housing coordinator to help create a housing plan.  For now, enrollment is
restricted to persons who meet the city's "locals" conditions and prioritization
criteria set by the ASL.

18.    The ASL is full nearly every night, with individuals sleeping outside,
where they are often subjected to questioning and harassment by the police.  The
only recommendation the ASL suggests for alternative shelter is the County winter
shelter program at the two armories in the North and Central SPA.  Those
suggestions are not practical because of the limited options for transit to those
facilities, as well as recently-imposed restrictions on admission.

19.    According to Homeless Management Information System (HMIS)
data, of 401 people who stayed at the ASL in 2017 and who provided a "last
known permanent address," more than half of these individuals reported an address
in Orange County but outside of Laguna Beach.  Only 11 percent of the guests
reported a last known address in the City.  Aliso Viejo topped the list of other

5

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

Orange County cities with 28 individuals, totaling seven percent of the population at the ASL. Mission Viejo had the second largest number of guests at the ASL, with 13 individuals, followed by San Clemente with 10 individuals.

**PAST LITIGATION IN ORANGE COUNTY:**

20. The Orange County Catholic Worker filed a lawsuit against the County of Orange and the cities of Orange, Anaheim and Costa Mesa on January 29, 2018. Case No. 18-cv-01115 DOC - JDE (C.D. Cal.). The lawsuit challenged the County's intended closure of the Santa Ana Riverbed encampment.

21. In response to the Court's order to end the encampment at the Riverbed, and the Court's subsequent order to end the encampment at the Santa Ana Civic Center, the County Board of Supervisors (BOS) voted to open three temporary emergency shelters to provide placements for the majority of the approximately 1200 people displaced from the Riverbed and Civic Center. The three temporary facilities were to be located in Irvine, Huntington Beach and Laguna Niguel. The announced intention of the BOS was to open the Irvine location first and then, if more space was needed, open the temporary facility in Huntington Beach and, if more additional space was needed, open the temporary facility in Laguna Niguel.

22. The County's plan was met with intense opposition from each community. Nearly 600 Irvine residents traveled to the BOS meeting to protest against the plan. Despite having the third largest number of homeless individuals of any City in the County,[4] 199 in the 2017 Point-in-Time count,[5] Irvine and

---

[4] In Appendix D to the 2013 Irvine General Plan, the City identified a far greater number of homeless individuals in the City, which appears to be an error. " Irvine's share of the regional unsheltered homeless population is estimated to be 2,280 individuals."

[5] Only Santa Ana and Anaheim had more homeless persons in the 2017 PIT count.

6

officials and residents adamantly argued that there was no place in Irvine – the largest land mass city in the County - that could accommodate an emergency shelter, let alone any shelter.  The City identified multiple zones where shelters could be placed by right.  In Appendix D to the City's 2013 Housing Element, the City wrote that emergency shelters are permitted by right in the IBC Multi-Use, General Industrial, Medical and Science, Business Park, and Institutional zones. Despite that representation to the California HCD, the City threatened to sue the County if a shelter was opened. The City listed these properties as a necessary statutory requirement for the City's General Plan to be approved by the State of California.  Without meeting this requirement, the City would not be permitted to approve any permits for development in the entire City, including permits for all of the upscale residences at the former military base.

23.    In late April 2018, the South County Mayors counter-proposed use of a former elementary school in Silverado Canyon.  Subsequently, the possibility of using the now closed juvenile detention facility in the Cleveland National Forest was also raised.  Neither site was appropriate.  Both were isolated and did not meet the requirements of SB2 to ensure that facilities for unhoused persons were close to transportation so that individuals can get to work, access social services, medical appointments, and other basic resources.

24.    It is unlikely that even homeless persons with an income from a low-wage job or disability can find rental housing in South County that is affordable. On June 1, 2017, HUD issued a report finding that the vacancy rate in Anaheim, Santa Ana, and Irvine declined from 2010 to 2017 from 5.9 % to 3.6%, and

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

average rents rose 3% in May 2017 alone.[6]  Almost 90,000 people are on the County's housing authority waiting lists hoping for access to affordable housing.[7]

25.     The lack of adequate and appropriate resources was reinforced in a 2017 report issued by United Way, prepared with the University of California Irvine and the Association of California Cities.   The report, "Homelessness in Orange County: The Costs to Our Community," found that 75 percent of homeless individuals surveyed lived in Orange County for at least six years, with most more than 10 years.[8]  Cutting against the stereotypes that homeless individuals are substance abusers or mentally ill, the United Way report found that the single greatest factor leading to homelessness in Orange County, by far, is "the gap between the availability of affordable housing and work that pays a wage sufficient to enable the economically marginal to access that housing."[9]

26.     Each of the Defendants has failed to meet the requirements in state law to provide for people experiencing homelessness in South County as a necessary prerequisite to approval of the entities General Plan for development. While the County has created several hundred more low-barrier and bridge shelter beds over the last three years, it is nowhere near the number of beds needed to address their responsibility.  San Clemente has not made any attempt to meet this need and repeatedly blocked efforts to place shelters in its City.  The most recent

---

[6] U.S. Dep't of Housing and Urban Development, Office of Policy Development and Research, *Comprehensive Housing Market Analysis Anaheim-Santa Ana-Irvine, California*, https://www.huduser.gov/portal/publications/pdf/AnaheimCA-comp-17.

[7] Susan Price, An Assessment of Homeless Services in Orange County, http://bos.ocgov.com/ceo/care/HOMELESS%20ASSESSMENT%20DCC%20REPORT_10.18.2016.pdf, pg. 21

[8] Homelessness in Orange County: The Costs to Our Community, *available at* unitedwayoc.org/wp-content/uploads/2017/08/united-way, p. 31.

[9] *Id.*, p. 34.

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

instance occurred in early September, when the City Council, once again, rejected a proposal to open a 35-bed shelter.

27.    San Clemente in the meantime has continued to threaten enforcement of local and state Penal Code provisions criminalizing homelessness through laws that make it unlawful to be present, have property, sit or sleep in a public place even if a person is without a home.

28.    The need to respond to the increasing numbers of unsheltered individuals in Orange County is hardly new and neither is the disfavored approach of criminalizing - rather than housing - people who are homeless.  More than a decade ago, the Orange County Grand Jury issued a report on "The Homeless Crisis in Orange County."  The report noted then that "[h]omelessness is on the rise, often misunderstood, and is inextricably linked to poverty."  From 1990 to 2005 the homeless population increased at a far greater rate than the overall increase in population in the County.  The Grand Jury report concluded that addressing the problem "does not appear to be a priority with the Board of Supervisors."  The Grand Jury listed a series of measures to address the crisis then being considered by various municipal entities in the County, including plans to add housing for homeless individuals at the former El Toro Marine Air Station; shelters in San Clemente, Buena Park, Westminster, La Habra and Cypress, and a very "humanistic" outreach approach by the Santa Ana Police Department and Orange County Sheriff's Department.  A dozen years later, few, if any, of these intentions have been realized.

29.    The 2005 Grand Jury Report also reviewed the history of proposals in similar reports, going back to 1988 and found that few of the earlier recommendations were implemented. The Report proves that, over the past 25 years, the primary response of the County and the Cities has been to treat the visible presence of homeless people as a blight, without significantly reducing the number of residents on the street each night.  These approaches include

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

criminalizing homelessness by arresting homeless individuals for loitering, making it illegal to sleep in public places at night, seizing and destroying homeless people's property, and engaging in a pattern of warrantless stops and interrogations. The identical practices have been repeatedly challenged and enjoined by judges of the Central District in Los Angeles and the Ninth Circuit, uniformly rejecting these practices criminalizing homelessness as a violation of the First, Fourth, Eighth and Fourteenth Amendments.

30. The 2017-2018 Grand Jury Report, "Where There's Will, There's a Way Housing Orange County's Chronically Homeless," issued in late May, 2018, echoed the conclusions in the 2005 Grand Jury Report. It cited the lack of political will and cooperation between the County and the cities as a significant factor in the inability to develop and implement a comprehensive plan to address the unhoused population in the County, emphasizing the extraordinary cost benefits to providing housing and services as a proactive measure.

31. Beyond the financial costs to the government from having a significant unsheltered population living on the streets and in the parks, the Grand Jury underscored the dire consequences for people left to survive on the streets. As discussed above, people experiencing homelessness are more susceptible to illness and infection because of exposure to the elements, poor nutrition and other factors. The consequence is that the average life expectancy for an unhoused person in the United States of only 50 years, almost 50 percent less than the 78-year life expectancy for the housed population.

32. Defendants' approach is even more indefensible when viewed against the directives by the United States Interagency Council on Homelessness ("USICH"), composed of nineteen federal cabinet and agency heads to organize federal efforts to end homelessness. The most recent USICH report, "Ending Homelessness for People Living in Encampments," emphasized the importance of "intensive and persistent outreach and engagement," but underscored that outreach

is meaningless without real options for placements and services.

33.     The San Clemente plaintiffs illustrate this point.  The City contracted with Mercy House to provide services, but the only shelter option offered is the Courtyard in Santa Ana.  That is not a realistic option for a number of reasons.  First, the Court restricted other cities across the County from "dumping" individuals off at the Courtyard when those same cities lacked shelters in their own jurisdictions.  This disfavored practice led to increased numbers of homeless individuals in Santa Ana and Anaheim, the two cities in the County that have carried more than their share of the obligation to address homelessness.

34.     Requiring individuals to travel to Santa Ana or Anaheim to find shelter is an impossible challenge for those with disabilities for a number of reasons.  As the County has now recognized, among other deficiencies, the Courtyard is not structured to accommodate individuals with significant disabilities, as many unsheltered individuals have.

35.     The physical factors at the Courtyard do not provide adequate reasonable accommodation of disabilities.  For persons with a trauma-enhanced disability, the conditions in the Courtyard, as well as the two County-run emergency winter shelters at the armories, exacerbate their mental health conditions.  The numbers at the Courtyard are near or above 400 persons each night, sleeping in close quarters on small cots with no privacy for women.  On most nights, people camp on the sidewalk outside the Courtyard because they cannot get a bed inside.   Because the Courtyard is not near any other shelter, a person who shows up and is told that the Courtyard is full has no choice but to sleep outside because it is too late to find transportation and get to other shelters to ask for a bed, such as the armories, before they close for the night.  Most of the year, there is no other shelter available.

36.     In April 2018, to ensure that there was space for individuals being relocated from the nearby Santa Ana Civic Center encampment, the Court

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

temporarily restricted the County from placing additional people who were not Santa Ana residents at the Courtyard and also directed that other cities, acting through contract agencies such as CityNet, stop transporting people to the Courtyard to ensure that there was space for individuals being relocated from the nearby Santa Ana Civic Center encampment.  Until the Court's directive, people were regularly dropped off there by hospitals, various cities' police, social workers and outreach agencies contracted with other cities in the County, and others with nowhere else to bring homeless people.  Several hundred individuals were then relocated to the Courtyard temporarily when the Santa Ana Civic Center encampment was removed.

37.    The only other options for low-barrier facilities in the County are the winter emergency shelters at the armories in Santa Ana and Fullerton, both of which   suffer from numerous deficiencies.  People sleep on thin mats on the floor, making it difficult for anyone with a physical disability to accommodate to as a matter of course.  There is no provision for persons with psychological trauma.  Moreover, the armories only accept people who are able to come and go at the restricted hours. For those who work, need to attend court or school or meet with service providers, restricted entrance and exit hours impose an additional and often insurmountable hurdle.  Both armories require individuals to leave very early in the morning and preclude readmission until the evening.  Beginning this year, the armories will not allow walk-ups.  People must leave the area in the morning and come back in the late afternoon on a scheduled bus.  While this change was, no doubt, made to discourage individuals from moving to nearby parks to wait all day until the armory reopened, the impact of this policy change is devastating.  There is no place for unsheltered individuals to stay safely during the day without facing a threat of citation or arrest if they are in public places with or without their property.

38.    The third reason why transporting people from South County to Santa Ana and Anaheim is an untenable and unlawful solution is that it makes it nearly

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

impossible for homeless individuals to get to jobs and services in South County. San Clemente is 31.5 miles from Santa Ana. By public transportation, the travel time is nearly 2 hours once a person gets to the train transit sites at either end, which involve walking slightly more than a mile at each end. For a disabled individual, the one-mile walk can take considerable time, because of physical mobility and cognitive impairments. For an individual with circulatory problems and other medical conditions, the walk to get to the train may be physically impossible. For someone such as Plaintiff Duane Nichols, it may be unnavigable because of his visual disability. Finally, for any unsheltered person, the cost of the train may be prohibitive and they have no place to put their property.

39.    In addition to the Courtyard and Bridges, there are private facilities providing a continuum of options for unhoused persons. Each has strict limitations on eligibility for services. Nearly all have significant time constraints on how long a person may reside at the facility, ranging from one night to six months. Some require a referral and/or a background check for entry, which can delay entry for days or weeks. Some are restricted by gender, some for pregnant women, and some only for women or families with children. Still others, such as the Rescue Mission in Tustin, require participation in sectarian worship as a condition of receiving services. Most have a blanket prohibition on pets other than registered service animals despite the fact that federal and state Fair Housing laws apply to public and private shelters and, with federal and state disability protections, require that emotional assistance animals be allowed as a reasonable accommodation.

40.    For example, the Salvation Army Hospitality House in Santa Ana is listed in the Housing Element of most of the cities in Orange County as a resource for each city's unsheltered population. This facility offers only 25 beds for transitional housing and 25 beds for emergency shelter, all for men. To stay there, a man must be able-bodied and employable. Service animals are admitted only with federal paperwork. No emotional assistance animals are allowed. Attendance

13

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

is required at a pre-dinner meeting that includes a sectarian religious service with prayer.  Clients must arrive between 3:30 and 5:00 p.m.  Men seeking admission must arrive by 3:30 in the afternoon to enter a lottery for any available emergency shelter beds.  If not selected, they can wait until 5:00 to see if a man who is already approved missed curfew. There are almost always more applicants than beds. In January 2018, between 2 and 12 lottery beds were available nightly.

41.    Another shelter, Colette's House in Huntington Beach, is open only to women and children.  In this six-month transitional program, women are required to have a job and work 32 hours per week.  No animals are allowed.  Colette's House is a small shelter and is usually at capacity.

42.    Friendship Shelter operates the Alternative Sleeping Location (ASL) in Laguna Beach in South County.  The shelter has only 45 beds, all of which are usually filled each night.  In addition to the ASL, Friendship Shelter operates a second facility in Laguna Beach that is a 60-day self-sufficiency program. According to Friendship Shelter's website, the 32-person facility always has a waiting list and is only available to individuals who are able to work.

43.    The Rescue Mission in Tustin is one of the larger private shelters in the County, with approximately 200 beds available.  However, it requires persons to submit to an intensive Christian religious program as a condition of receiving services.  It also requires people be employed, which is a significant barrier for many of the unsheltered individuals in South County, who are seniors, disabled or both.  In addition, the Rescue Mission does not permit individuals to bring in certain prescriptions containing opioids which are commonly prescribed for mental health conditions, especially panic and anxiety disorders. This leaves people with lawful medical prescriptions at risk of psychological deterioration and, in some cases, has produced suicidal ideation from the sudden and complete withdrawal of prescribed medications.  Individuals are not allowed to have assistance animals other than registered service animals.

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

**THE COUNTY'S EFFORTS TO OPEN ADDITIONAL SHELTERS:**

54.    In its General Plan, the Defendant County states it is proactive in responding to the needs of the homeless population.  When the County prepared its 2013-2021 General Plan, there was only one small emergency shelter located in the unincorporated area of the County – American Family Housing in Midway City -- with a maximum capacity of 20 persons.  Recognizing the significant shortfall between available and needed emergency shelter, and to encourage additional shelter facilities, the County amended its Zoning Code to allow shelters by-right in the commercial and industrial portions of the Housing Opportunities Overlay Zone. This added 177 acres that meet the requirements of SB2 as locations that are served by transit and other critical resources and available for additional emergency shelters.

55.    Over the course of the past several years, multiple cities in the County, including Fullerton, Irvine, Huntington Beach and Laguna Niguel, have blocked the County's plans to locate new emergency shelters in their communities for reasons other than those allowed by the Housing Accountability Act.  In each instance, the cities acted based on NIMBYism and failed, completely, to provide any justification for the denial that complies with the requirements of SB2.

56.    In 2013, the County identified two locations as potential sites for emergency shelters.  The first was in Santa Ana.  Although the city originally approved the County's proposal, its approval was rescinded after community objections. The County then identified a location in Fullerton in a commercial site. The County BOS approved the purchase of the site in early January 2013.  Two years earlier, following the killing by Fullerton Police of Kelly Thomas, a mentally ill homeless man, Fullerton created a homelessness task force.  The task force issued a report in 2012 with eight recommendations, one of which was to establish a year-round emergency shelter in the City in partnership with the County. To date, that has not happened.

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

57.     Instead, when the County proposed a location in the city for the first
emergency shelter in the area, Fullerton asked that the project be delayed to allow
the City to review it further.  Ultimately, based on objections by the community,
the City blocked the shelter, resulting in a lawsuit against the City by non-profit
groups.  The lawsuit alleged that the City's actions violated Government Code §
65589.5.  Last fall, the Fullerton City Council has again rejected a proposal to
create a shelter in the city, concluding first that it was "too soon" to make the
decision and then, after a local election was completed, rejecting the proposal.  The
City has now committed financial support to two new shelters in the Northern
SPA, both located in other cities.  In addition, as a condition of opening the winter
emergency shelter at the Fullerton Armory, the City has required that admission to
a winter emergency shelter be by referral only, although it remains open to all
unsheltered individuals in the County.

58.     After losing out on the initial Santa Ana and Fullerton sites, the
County then identified the former bus terminal in Santa Ana as the location for the
first – and only – year-round, low-barrier emergency shelter in the County.  The
shelter opened in 2016 with approximately 250 beds, but soon rose to over 400
individuals sleeping there each night, evincing the undisputable demand for shelter
among people experiencing homelessness in Orange County.  The Courtyard
shelter continues to operate at or slightly above the number on a nightly basis,
limited only by orders of the District Court restricting a higher capacity because of
the challenges overcrowding presents to a service population experiencing multiple
disabilities.

59.     One goal of the Courtyard was to provide a place where people
encamped in the nearby Santa Ana Civic Center could go.  Because of the
desperate need throughout the County for emergency shelter space, people from
other communities soon filled the beds and the Civic Center encampment
continued for nearly two more years, until the Court ordered it disbanded in March

16

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

2018.

60.     With the relocation a year ago of more than 750 unsheltered people living at the Riverbed and the Court's order to dismantle the Civic Center encampment, the County Board of Supervisors voted to approve three additional locations for short-term emergency shelters while it developed and implemented a long-term plan for addressing homelessness because the beds at the Courtyard and Bridges, a referral-only facility in Anaheim, were full.  The vote to approve additional sites occurred in late March 2018.  Each proposed site was on County-owned land in an SB2 zone.  Three locations were announced: Irvine, Huntington Beach and Laguna Niguel, all in South County.

61.     Immediately after the County vote, all three cities objected vigorously, ultimately forcing the BOS to rescind the vote.  Irvine transported nearly 600 people by chartered bus to the BOS meeting where the proposal was ultimately withdrawn.  The City sued the County, raising claims of Brown Act violations in the site approval process and characterizing the planned emergency shelter as a "public nuisance."  At the same time, Irvine touted its affordable housing work.  But, affordable housing is not a substitute for housing for homeless persons as required by State law by Government Code § 65530 et seq., the Housing Accountability Act and SB2.  None of the three proposed cities has an emergency shelter in its geographic boundary, as Irvine implicitly conceded in its lawsuit touting only its efforts to include "affordable" housing.  The shelter resources each City lists in its Housing Element are in other cities or restrict services based on employability, gender, pregnancy status, families with minor children and other categories.

62.     The November 2016 list of Emergency Shelters and Housing Programs available on the website of South County Outreach documents the lack

17

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

of facilities in this region specifically and the County generally.[10]   Approximately

three dozen resources offer housing for unsheltered families, women with children,

pregnant women, single women and domestic violence survivors. Many, if not

most, of these are private facilities run by religious groups.  Some of these

programs have prerequisites to admission, such as a $300 fee or a referral from an

emergency shelter program.  There are only seven facilities that accept single men.

Of these, some allow only a one-night stay, others limit a stay to 14 days, while

still others require that a person be employable.

63.      The South Coast Outreach list of Emergency Shelters and Housing

Programs is the same list that nearly every entity puts forward to meet the

requirements for approval of a General Plan.

## PARTIES

**Plaintiffs:**

64.      Plaintiff **HOUSING IS A HUMAN RIGHT ORANGE COUNTY**

("**HHROC**") is a coalition of entities and individuals working together to achieve

supportive, affordable, and permanent housing for homeless individuals in Orange

County, with appropriate and adequate wrap around services as needed.  The group

includes both housed, formerly unhoused and currently unhoused persons.  The

participants in **HHROC** go to where they understand unsheltered individuals to be

and provide much-needed support that the County of Orange, cities and

municipalities fail to provide.   This includes, but is not limited to, creating

community through preparing and sharing meals, collecting and distributing

clothing; assist with making appointments and transporting individuals to

doctor/dentist, DMV, Social Services, and veterinarian appointments.  They

_____

[10] www.sco-oc.org/wp-content/uploads/2014/05/Shelters.pdf

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

provide this assistance throughout County, including in South County.

65.    The members of **HHROC** expend their own funds to provide this assistance, including purchasing food and other items needed by persons experiencing homeless.  The members of **HHROC**, and each of them, pay taxes to the County of Orange when they make these purchases.  On information and belief, each of the municipal Defendants receives funds derived from the payment of taxes to the County.  Because of the lack of adequate shelter for people experiencing homelessness in Orange County, including in South County, **HHROC** is required to shift and expend resources to providing immediate direct services, as described above, and redirected its time and money from its primary focus of achieving supportive, affordable and permanent housing for people experiencing homelessness in the County.

66.    Plaintiff **EMERGENCY SHELTER COALITION OF SAN CLEMENTE ("ESC")** is now, and at all times since its incorporation on July 30, 2018 was, a non-profit organization under the laws of the State of California.  The members of the **ESC** share a common goal to establish a year-round emergency shelter and resource center in San Clemente to provide people experiencing homelessness with a safe place to sleep, engage in fundamental daily life activities and obtain counseling and referral services. The members of **ESC** include individuals who are residents of, employed in, or recreate in the City and who devote their time and resources to assisting persons experiencing homelessness in San Clemente, regardless of the reason.  Because of the lack of resources throughout South County, **ESC** and its board members provide assistance to persons experiencing homelessness in the region.  Because of the lack of services throughout South County, the **ESC** provides assistance to individuals experiencing homelessness not only in San Clemente, but almost every city in South County, including numerous unsheltered individuals from San Juan Capistrano, Dana Point,

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

Mission Viejo and other cities that have similarly failed to provide assistance to unsheltered individuals in their respective communities in South County.

67.    Beginning in or about 2014, **ESC** was engaged in litigation with the City of San Clemente to compel the City to bring itself into compliance with its statutory duties under Government Code §65588(e) to adopt an updated Housing Element that (1) establishes at least one zone in which emergency shelters are permitted by right without any discretionary approvals by the City; (2) demonstrates adequate capacity to meet the City's need for emergency shelter; and (3) promulgates standards designed to encourage and facilitate the development of emergency shelters in appropriate locations, including at least one year-round facility.  In August 2016, the Hon. Robert J. Moss of the Orange County Superior Court entered judgment in favor of **ESC**, directing the City to revise its Housing Element to conform to its statutory obligations.  **ESC** continues to work toward developing a shelter in the Emergency Shelter Overlay Zone identified as a result of the successful litigation by **ESC.**

68.    Plaintiff **DUANE NICHOLS** is a 60-year-old veteran who is homeless in San Clemente.  He is eligible to upgrade his original "Other than Honorable" discharge.  He has no income at present.  Because of his significant disabilities and the distance involved, he is unable to get to a County office to apply for General Relief or any other form of public assistance.

69.    Over the course of the past six months, he has been contacted a few times by Mercy House, the contract services outreach agent for San Clemente.  The primary assistance offered by Mercy House was an offer to transport Mr. Nichols to the Courtyard in Santa Ana or the ASL in Laguna Beach.  OCSD deputies threaten him with jail if he does not go to a shelter, but neither the Courtyard or the ASL are viable options because both are generally at or over capacity every night, with people sleeping on the sidewalks around the facilities.  Both require a referral for admission or give priority to local residents.  During one recent rainstorm,

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

Mercy House came with law enforcement and offered motel rooms with two people in a room for two nights only.  When Mr. Nichols arrived at the motel, he learned that there were 4 people in a very small room and that they would only be sheltered for one night, returning him to the streets.

70.    Mr. Nichols is physically, medically and visually disabled.  He uses a tricycle for mobility assistance.  Earlier this year, a medical professional accompanied the outreach workers from Mercy House.  Although Mr. Nichols was offered medical assistance, in order to do so he was required to check in at the Family Assistance Ministries ("FAM").  His compound disabilities make it difficult, if not impossible, for him to get to the FAM location.  He suffers from COPD, blood clot issues, hip problems, limited vision and severe arthritis. Moreover, he feared losing his property because he has no place to leave his property when he goes to FAM and cannot transport it with him.  With great difficulty, he made the trip to FAM several times to check in with a FAM caseworker but was repeatedly told only to come back in two weeks.

71.    Mr. Nichols used to sleep in the parking lot at the train station.  On many nights, he was awakened by sirens as deputies arrived and threatened him with arrest if he did not leave.  He was ordered by OCSD personnel to leave the City.

72.    Mr. Nichols stays at the San Clemente campsite location on Avenida Pico in San Clemente, which is the former parking lot for the Sewage Treatment Plant.  He is there because he does not want to be arrested despite the fact that the conditions at the campsite exacerbate his disabilities.  Mr. Nichols has medication which needs to be temperature controlled but has been forced to camp in a location without shade throughout the hottest part of the summer. In addition, Mr. Nichols has difficulty walking without a tricycle that he uses to get around.  Because there is no source of drinking water located in the camp, Mr. Nichols uses his tricycle to get drinking water.  To do so, Mr. Nichols must travel a quarter mile downhill to

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

the light, cross the street, and then travel up a steep grade to get to the park across the street. This is not accessible with his tricycle except with great difficulty that further impacts his health. Because of Mr. Nichols' vision disability, it is not safe for him to jaywalk directly across the street to the park; nor is requiring persons with mobility disabilities to jaywalk to access clean water and toilets a reasonable accommodation under the ADA.

73. Plaintiff **DARREN JAMES** is disabled and homeless, living in San Clemente. For about two years, he has stayed in the same area but over the past several months, law enforcement have rousted him in the middle of the night, telling him to move or be arrested.

74. Until about two years ago, Mr. James kept his belongings in a storage unit. At that time, he had income from SSI. When his SSI was terminated unexpectedly, he could no longer pay for the storage unit and thereafter kept everything he owned with him. He always left his property neatly packed. In early February 2019, all of his possessions were taken from the location where he left them daily for two years. Mr. James lost them on a day that the City was performing a cleaning at that location. He approached a person in the area who he understood to be a City employee and part of the maintenance operation, asked about his possessions, and was informed that the City did not retain the property. Mr. James lost everything he owned, including his sleeping bag, blankets, cowboy boots he had had since he was a child and other sentimental items and family pictures, his birth certificate, and all of his personal papers.

75. Like Mr. Nichols, law enforcement approached Mr. James at night, woke him up and told him that he had to move or face arrest. He understood that he was being threatened for sleeping in public, even though there were no shelter beds available in South County to accommodate him. In early summer 2019, Mr. James was placed in housing by the Friendship Shelter. He is currently no longer camping in San Clemente.

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

76.     Mr. James suffered trauma and emotional distress by being repeatedly threatened with arrest when he had nowhere else to go.

**Defendants:**

77.     Defendant **ORANGE COUNTY** is a government entity with the capacity to sue and be sued.   The Board of Supervisors is the governing entity for the County. The Board of Supervisors is responsible for developing and implementing the General Plan, including addressing the need for housing and shelter for low-income and homeless individuals.  The departments of the COUNTY include the Orange County Sheriff.  Employees of the COUNTY have engaged in the acts complained of herein pursuant to the policies, practices and customs of the COUNTY.

78.     The OCSD is the contract law enforcement entity for 13 cities in the County, most of which are in South County, including San Clemente.  The OCSD has engaged with homeless individuals in contract cities and enforced local ordinances in those jurisdictions that mirror the ordinances criminalizing homelessness in the Defendant County and cities.  The OCSD has also applied and threatened to apply the County's "quality-of-life" ordinances to compel members of the Plaintiff class to move from public spaces when they have no other place they can lawfully be.  In San Clemente, law enforcement has made it clear that homeless persons are not welcome in the city, their mere presence is a crime, and they will be ticketed or arrested if they remain.

79.     Defendant DOES 1-4 are employees of the City of San Clemente who threw away Plaintiff DARREN JAMES' personal possessions. Mr. James had his possessions go missing during a City cleaning, and a city employee on site told Mr. James that his possessions had not been retained by the city.  On information and belief, Mr. JAMES alleges that a city employee seized and destroyed Mr. James' possessions in the course of the cleaning, even though the City employee(s) knew or should have known that the property was not abandoned and, in any event,

23

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

should have preserved the property so that Mr. James would have had an opportunity reclaim it. The names of the DOE defendants are currently unknown.

80.    The Defendant **CITY OF SAN CLEMENTE** is a government entity with the capacity to sue and be sued. The Orange County Sheriff's Department is the contract law enforcement agency, acting as employees, for the City, charged with enforcing City law within its geographic boundaries. One department of the Defendant City is the San Clemente Maintenance Department. Employees of the City have engaged in unlawful activity, taking property without notice that they know or should know is the essential property of unsheltered homeless individuals in San Clemente, who have no to leave their property during the day while they go to services, work and attend to other daily tasks. Although the OCSD has stopped arresting homeless individuals for quality-of-life violations, deputies continue to threaten citation or arrest if homeless people do not leave public spaces where they have a constitutional right to be and remain.

81.    The **CITY OF SAN CLEMENTE** was previously sued by the organizational Plaintiff ESC based on the City's failure to comply with the mandatory requirements of Gov. Code §§65583 et seq., in that the City failed to identify any site within the City that met the requirements of state law to allow operation by right of a shelter serving homeless individual without additional governmental restrictions on the entity. The Orange County Superior Court enjoined the City from approving any development plans until it was in compliance. Although the City then identified a zone where a shelter could be located and operated by right, the property was, in fact, not feasible and the City knew or should have known that. At present, there is no location in the City that is approved and meets the requirements of §§65583 et seq. The City has rejected every proposal by the Plaintiff ESC to identify a location for a shelter in the City.

82.    Over the past several months, the **CITY OF SAN CLEMENTE,** through its employees and agents, has fostered a climate of fear directed at people

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

experiencing homelessness in the city.  Homeless individuals have been barred from locations where they previously stayed, largely out of sight.  They were told by the OCSD, the contract LEO for San Clemente, that they not be at the train station except limited purposes, could not stay at the beach or a public grassy area where they had stayed, and other similar relocations every time they moved.  They have been forced into more public spaces where they have become the target of residents virulently opposed to the presence of homeless individuals.  For example, as part of a concerted campaign to force homeless individuals out of public view and out of the city, several individuals have parked their trucks in such a manner as to have the fumes from the exhaust blow in the direction of homeless individuals on public sidewalks, where they have a right to be under *Martin v. City of Boise* in a municipality that lacks any shelter beds.  These individuals have left their trucks running to maximize the toxic impact of the engine exhaust.  Others have made it a point to transit the sidewalk with wheelchairs, challenging ADA compliance.  Some, if not most or all of the individuals are able-bodied as evinced by the fact that these individuals are observed rotating who is being pushed and who is sitting in the wheelchair.  Still others scream at the homeless individuals in public spaces while law enforcement does nothing.

83.    Each of the Defendants, their employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The Defendants developed and implemented a coordinated plan to increase enforcement actions against the homeless community in the Riverbed and surrounding cities.  The challenged acts caused the violation of Plaintiffs' rights.

84.    The identities and capacities of defendants DOES 1 through 10 are presently unknown to plaintiffs, and on this basis, Plaintiffs sue them by fictitious

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

names.  Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE defendants when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES 1 through 10 are, and at all times relevant herein were, employees and/or agents of the Defendant COUNTY and Defendant CITIES and are responsible for the acts and omissions complained of herein. Defendants DOES 1 through 10 are sued in their official and individual capacities.

### FIRST CAUSE OF ACTION

### Violation of Eighth and Fourteenth Amendments (42 U.S.C.§1983)
### (By All Plaintiffs Against All Defendants)

85.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

86.     The acts and omissions of Defendants, and each of them, as described herein, violated the constitutional rights of Plaintiffs to be free from actual or threatened cruel and unusual punishment.  By virtue of their status as homeless and disabled, and the absence and insufficiency of shelter or housing in South County, Plaintiffs had no way to comply with the laws Defendants sought to enforce against them.

87.     The Orange County Sheriff's Department acted as an agent of the City of San Clemente in enforcing the municipal ordinances against camping and loitering, and at the City's request roused and threatened unhoused people such as James and Nichols with arrest.

88.     Plaintiffs further allege that it violated their substantive due process rights to threaten them with citation and arrest for sleeping and keeping their property in public places when there is inadequate shelter available.  The Defendants, and each of them, lack adequate and appropriate shelters to provide a safe place for the Plaintiff class to sleep and simply be.  Instead, Defendant San Clemente, by and through the Orange County Sheriff's Department, enforced "quality-of-life" violations and, prior to the urgency ordinance, expected Plaintiffs

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

James and Nichols to move out into neighboring cities, in which similar ordinances prevent them from lawfully residing without shelter, having their property in public places, and loitering laws prohibit their mere presence in these jurisdictions.

89.    The citation and threats of citation for behavior such as sleeping in or keeping personal property on public space when there is inadequate shelter available violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 7, §17 of the California Constitution.

90.    Each Defendant has a custom, policy, and/or practice of encouraging its officers, employees and agents to threaten enforcement of City ordinances and citations and arrest of homeless persons for the unavoidable behavior of sleeping or having property in public based on their unhoused status.  This custom, policy and/or practice harmed both Nichols and James by depriving them of sleep and causing them emotional distress.

## SECOND CAUSE OF ACTION
## RIGHT TO DUE PROCESS OF LAW; 42 U.S.C. § 1983
## FIFTH AND FOURTEENTH AMENDMENTS
## (By Plaintiff JAMES against the CITY OF SAN CLEMENTE and DOES 1-4)

91.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

92.    The CITY OF SAN CLEMENTE, and their employees and agents, including DOES I-4, owed Plaintiff DARREN JAMES a duty under the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution to protect the personal property of the Plaintiffs.

93.    Despite this well-defined duty, Defendant CITY of San Clemente and DOES 1-4 provided Plaintiff with no notice that his property was at risk of being seized and/or destroyed and did not act to preserve the property or provide any means of reclaiming it in a timely manner, even though Defendant CITY was put

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

on notice by past court decisions, including decisions at the Ninth Circuit Court of Appeals, that such notice and preservation of property was required.

94.     Plaintiff is informed and believes that the acts of Defendant CITY, and its employees and agents, including DOES 1-4, were intentional in failing to protect and preserve Plaintiff's property and that, at minimum, Defendant CITY was deliberately indifferent to the likelihood that the property would be seized and destroyed without due process based on the past occurrences of these same constitutional and statutory violations of the law.

95.     Defendant CITY OF SAN CLEMENTE seized and destroyed the personal property of the Plaintiff DARREN JAMES without due process, lawful justification, or just compensation.  On information and belief, Defendant CITY OF SAN CLEMENTE and Does 1-4 executed this procedure pursuant to its policies and protocols regarding property left in public.

96.     As a direct and proximate consequence of the acts of Defendant's agents and employees, including DOES I-4, Plaintiff DARREN JAMES has suffered loss of his personal property and is entitled to compensatory damages for their property and other injury to their person.

## THIRD CAUSE OF ACTION
## FOURTH AND FOURTEENTH AMENDMENTS
## VIOLATION OF RIGHT TO BE FREE FROM UNLAWFUL PROPERTY SEIZURE
### (By Darren James Against Defendant San Clemente)

97.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

98.     The CITY OF SAN CLEMENTE, and its employees and agents, including DOES I-4, seized and summarily destroyed the property of Plaintiff DARRELL JAMES without a warrant or prior notice.  The property was not abandoned.

SECOND AMENDED COMPLAINT: CIVIL RIGHTS

99.    The seizure and immediate destruction of Mr. James' personal property when it was left at a location where he had been for two years, and where Defendants were aware he stayed, violated his rights under the Fourth Amendment against seizure of personal property without a warrant. On information and belief, Defendant CITY OF SAN CLEMENTE and DOES 1-4 executed this procedure pursuant to its policies and protocols regarding cleaning up property left in public.

100.    As a direct and proximate consequence of the acts of Defendant's agents and employees, including DOES I-4, Plaintiff DARREN JAMES has suffered loss of his personal property and is entitled to compensatory damages for his property, including pain and suffering as a result of the loss of irreplaceable personal items.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray as follows:

1.    For damages to the individual plaintiffs in an amount to be determined according to proof based on their federal claims only;

2.    For a declaratory judgment that Defendants' policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States Constitution   identified herein;

3.    For costs of suit and attorney fees as provided by law;

4.    For such other relief as the Court deems just and proper.

Dated: September 16, 2019        Respectfully submitted,

LAW OFFICE OF CAROL A. SOBEL
ELDER LAW & DISABILITY RIGHTS CENTER
SCHONBRUN SEPLOW HARRIS & HOFFMAN

By:_____/s/ Carol Sobel_____
CAROL A. SOBEL
*Attorney for Plaintiffs.*

29

SECOND AMENDED COMPLAINT: CIVIL RIGHTS